## WHITMAN v. BOWDEN.

1. Nine owners of contiguous lots united together for the purpose of erecting for themselves in severalty nine stores, with upper stories arranged for a hotel to be owned by them as common property. *Held*, that the general relation between these parties was that of an ordinary partnership.

2. Neither the relation of partners held by three of these parties, nor their position as a committee of the partnership to obtain bids, prevented them from openly and fairly contracting with the others to erect this building.

3. But this committee having put in a bid in a fictitious name for an amount which they had learned would be accepted by the association, and, upon its acceptance, having sublet the contract to strangers at a lower figure, and then procured an assignment of their bid to these strangers, with a secret agreement that the difference should be repaid to them by the builders, it was *held* that these three partners were liable to their copartners for six-ninths of the sum thus received by them.

4. This arrangement "leaked out," and the other parties, while expressing dissatisfaction with this agreement, continued to pay their proportion of the amounts called for by the building contract. *Held*, that the injured partners were not thereby estopped from enforcing this claim, nor did their payments operate as a confirmation of the rights secured by the defendants to themselves in the subletting contract.

Before HUDSON, J., Spartanburg, January, 1886.

The opinion states the case. The Circuit decree, omitting its statement, was as follows:

The learned referee in this case has found from the evidence and the law controlling the case, that the plaintiffs are entitled to recover six-ninths of the $2,500 with interest on so much of the respective instalments from the date of each payment. To his able report I must refer for a full statement of the facts found and conclusions of law. I do not think, however, that he is sus-

tained in his judgment by the law and the facts. The fundamental error is in regarding the defendants as standing in a fiduciary relation to the plaintiffs. They were charged with no special duty in this matter, except to call for bids. They were not delegated to find the lowest bidder and to close a contract with him. They were not entrusted with any special duty, except to advertise for bids. The bids were to be sealed, and in that state submitted to the company and not to the committee. The advertising was faithfully and efficiently done. They had no knowledge of the terms of any bid until they were all opened at a full meeting of the company. All were rejected and more bids were called for. At this second call, Maxwell, Lyman & Land put in a bid. The defendants, apprehending that the enterprise might fail, agreed to put in a bid at low figures and take the risk of profit and loss in the enterprise. This they did under the name of A. E. Simmons & Co., a brick manufacturing firm in Spartanburg. They knew nothing at all of the figures of other bids to be put in. Not a particle of evidence was adduced going to impeach the good faith of this move of the defendants—none of whom are mechanics, but merely business men with capital.

This bid was duly considered by the company with the others and accepted as the best and lowest bid of all. Surely, it cannot be said that after this any fiduciary relation existed between the company and these members whose bid was accepted. It was their clear right and duty, after this, to bestir themselves and seek a contractor to enable them to comply with this bid, which really had prevented the main enterprise from failing. It was, furthermore, their clear right to make the best terms possible for themselves in subletting the contract, just as it would have been their clear right to make all the profit possible had they hired workmen and themselves furnished the material and superintended the work.

When they went to the meeting of the company to execute their contract in due form, they then disclosed the identity of A. E. Simmons & Co., and brought their sub-contractors with them. All was revealed except the price at which they had sublet the contract, and no questions were asked on this score. This was no one's business or concern except their own. They were

under no duty or obligation to reveal it. The papers were signed directly by Maxwell, Lyman & Land, and the defendants became their bondsmen; and their's, the lowest bid, fairly made, and understandingly and fairly accepted, was put into the proper shape for practical performance of the contract. Betwixt the company and the defendants in this transaction we fail to discern such relation as exists between parent and child, guardian and ward, principal and agent, trustee and *cestui que trust.* It was a plain, legitimate transaction between intelligent business men.

A company can contract with a member or members to do work for it, and the ones thus employed enjoyed the privilege of fairly and honestly making a profit out of the job, provided it be fairly and honestly obtained. In such a transaction the contracting parties stand towards each other, not as fiduciaries, but as strangers, subject alone to the laws of honesty and good faith in performing the contract. This seems to have been recognized by the members of this company, who, after being informed of the fact that the defendants had sublet at a profit which they were realizing out of the instalments being paid to Maxwell, Lyman & Land, made no complaint, but voluntarily continued to pay the instalments until the work was completed, even after this suit was begun. Surely, then, these intelligent men, knowing all, and still voluntarily paying, cannot now be permitted to invoke the aid of the law to compel the defendants to refund. If they deemed the matter a fraud and imposition, they should have refused to pay one dollar over and above the $20,000; and should have asked the court to protect them in so refusing.

A man *sui juris*, intelligent and experienced in business, who voluntarily pays money which, with a full knowledge of all the facts, he believes to be an unjust demand, cannot be permitted to ask the court to correct his blunder and compel a repayment. If the defendants had been guilty of bad faith, fraud, and collusion in procuring the bid and effecting its transfer to M., L. & L., and after a full knowledge of these facts, the company had voluntarily made payment and thus sanctioned the wrong, the courts could not relieve them. But not only was no fraud perpetrated in securing the bid, but it was done in good faith and without collusion with any one, and practically resulted in saving the

enterprise from failure. The defendants underbid all competitors, secured the contract, and caused the building to become an accomplished fact. If they made profit instead of loss, the company should not complain. Had the defendants lost in the enterprise, they would have had to bear it. Having gained, they are entitled to the profit.

Taking this view of the law and the facts, I hold that the referee has erred in his judgment. It is therefore adjudged and decreed, that the defendants' exceptions to the report of the referee be sustained, and that his judgment be reversed, the complaint be dismissed, and the defendants have judgment for costs.

*Messrs. Carlisle & Hydrick*, for appellants.

*Messrs. Duncan & Sanders* and *J. S. R. Thomson*, contra.

June 28, 1887. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The plaintiffs and the original defendants, nine in number, being the several owners of nine adjacent lots in the city of Spartanburg, organized themselves into a company known as the "Merchants' Hotel Company," for the purpose of building nine store rooms, to be owned separately by the owners of the respective lots, and above them a hotel, to be owned and rented for the common benefit. The organization was effected in January, 1879, by the election of a president, secretary, treasurer, and a building committee. A resolution was adopted that each member should pay one-ninth of the cost of the building. It is stated in the complaint that the defendant, R. L. Bowden, and W. W. Thompson, since deceased, were appointed on the building committee, and in the testimony it is stated that Dr. Heinitsh, representing plaintiff, Dr. Dean, acted with this committee.

This building committee was instructed to advertise for bids, which being done and certain bids having been received, the company met to open and consider them. They were found too high, and were rejected and ordered to be returned to the bidders, with a request that they be reduced. In the meantime some informal conversation was had on the question of the amount

the company would be willing to give, and it was ascertained that some of the members, if not all, would be willing to allow $22,500. Other bids were received, and the company again met on March 13. Among the bids then presented was one in the name of A. E. Simmons & Co. of $22,500. This included some extra work not embraced in the plans and specifications. Inquiry was made as to who composed the firm of A. E. Simmons & Co. The defendants declined to tell; assurance, however, was given that it was composed of responsible persons, and that they could give a good bond to complete the work. On motion of Mr. Thompson, the contract was awarded to A. E. Simmons & Co., the lowest bidders, and the building committee was instructed to draw up a contract between the company and A. E. Simmons & Co.

It turned out that A. E. Simmons & Co. was a myth as to the name, and that the bidders under this name were the defendants, Bowden and Thompson, building committee, and Harris, who, after the contract was awarded to them as above under the name of A. E. Simmons & Co., sublet it to Maxwell, Lyman & Land (contractors in the city), ostensibly at their bid, but really at $20,000, Maxwell, Lyman & Land having assigned $2,500 of the contract to Bowden, Harris, and Thompson. This arrangement was at first kept secret from the company. After this, however, the company was informed of the facts, as to the parties composing the imaginary firm of A. E. Simmons & Co., and it was asked to transfer the bid to Maxwell, Lyman & Land, at the same price and upon the same conditions. This was consented to, the defendants saying that they would sign the bond of Maxwell, Lyman & Land. The plaintiffs, however, did not know at this time that defendants had transferred their bid to Maxwell, Lyman & Land at $20,000, the excess, $2,500, to be retained by them. This latter fact, however, after this became known, and although there was some expression of dissatisfaction, yet there was no formal action taken by the company, and the members continued to pay each his proportion of the building contract at $22,500.

The structure was finally completed, but not by Maxwell, Lyman & Land. They were settled with, however, upon the basis of their contract, they accounting for the unfinished work, about

$800, which, with other payments, amounted to $22,500, of which the defendants received $2,500; and this action was brought by the plaintiffs against Bowden, Harris, and Thompson, since deceased, demanding judgment that the defendants be required to refund to the plaintiffs the several amounts paid by them in excess of the amounts they were bound to pay under the contract made with Maxwell, Lyman & Land, &c.

The referee, William Munro, Esq., to whom the case was referred, after full testimony taken, reported as his conclusion of law, that the plaintiffs were entitled to share equally with the defendants, Bowden, Harris, and the estate of Thompson in the $2,500—$1,666.66 being the amount thereof to which the plaintiffs were entitled, with interest from certain dates; and he recommended that plaintiffs have judgment for said amount with the interest to be ascertained by the clerk. This report was overruled by his honor, Judge Hudson, who reversed the judgment of the referee and ordered that the complaint be dismissed with costs. Plaintiffs have appealed upon sixteen exceptions, which are as follows:

I. In holding that the defendants had procured Maxwell, Lyman & Land to undertake the contract after they had failed to get other contractors to take the bid for $22,500.

II. In holding that the defendants "were charged with no special duty in the matter except to call for bids; that they were not delegated to find the lowest bidders;" that "they were not entrusted with any special duty except to advertise for bids."

III. In holding that no fiduciary relation existed between plaintiffs and defendants after the bid of A. E. Simmons & Co. was accepted or before.

IV. In holding that there was no collusion between defendants and Maxwell, Lyman & Land to make a profit for the former.

V. In holding that the defendants acted in good faith in the transaction with their copartners.

VI. In holding that plaintiffs were estopped by their conduct.

VII. In holding that it was a plain, legitimate transaction between intelligent business men.

VIII. In not finding that the defendants stood in a fiduciary

relation to the plaintiffs, both before and after the bid of defendants was accepted.

IX. In not finding that the defendants concealed from their copartners facts which would have controlled their action in making the contract.

X. In not finding that the defendants took advantage of their knowledge derived from their copartners, of the amount which would be paid for the building contract, and used such knowledge to their own advantage and to the injury of plaintiffs.

XI. In not finding that the defendants procured the removal of S. B. Ezell, one of the original plaintiffs, from the office of secretary of the association, for the purpose of concealing from the plaintiffs their purpose to make profit for themselves from the contract.

XII. In not finding that it was the duty of the defendants to give to the association of which they were members the benefit of any contract which they could make to the advantage of the association.

XIII. In not finding that a bond for $500 for the performance of a $22,500 contract was in itself *prima facie* evidence of an intended fraud upon the plaintiffs.

XIV. In not holding that the failure of the defendants to complete the building was a breach of the condition of their bond.

XV. In not finding that the defendants are liable to plaintiffs for at least the value of the work which Maxwell, Lyman & Land failed to do under their contract.

XVI. In not finding that the report of the referee should be affirmed in his conclusions both of law and fact.

We think these exceptions may be condensed into, and discussed under, the following propositions: 1st. Did his honor err in failing to hold that such a fiduciary relation existed between the defendants and the plaintiffs as forbade the defendants from making the contract complained of, and especially under the circumstances of secrecy, &c., attending said contract? And 2nd. Were the plaintiffs estopped by their conduct, as held by his honor?

We think the general relation between these parties was that of an ordinary partnership. They had united themselves together,

without a charter, however, for the purpose of erecting a build-
ing, a large portion of which was to be common property, and to
be used as a hotel·for common benefit, the members agreeing to
pay each an equal proportion of the cost of said building, and no
doubt to share equally in the rental profits of the hotel.    This
made them a partnership and they bore to each other the relation
of partners.    In addition to this general relation, which all of the
members of the company sustained to each other, Bowden and
Thompson, having been appointed a building committee, occu-
pied the relation of agents to the company, for the discharge of
such duties as might be required of them, in having the building
erected.    Now, were these relations, one or both, of such a fidu-
ciary character as to bring the defendants under that well estab-
lished equity doctrine, that a trustee cannot make profit out of
the estate or property of his *cestui que trust*—that doctrine which
vacates a purchase by a trustee from himself, regardless of the
fact whether fraudulent or not, which declares illegal and forbids
any such purchase without inquiring into the question whether
or not it has been *bona fide ?*    *Fox* v. *Macreth,* 1 *Lead. Cas.
Eq.* ( *Wh. & T.*), 115.    Without considering now the special cir-
cumstances under which the defendants obtained the building
contract, the case presents the fact that three of the copartners,
the defendants, did obtain such a contract from the firm.    Is
there any law which forbids one partner from being employed by
the firm to do the work of the firm ?    Does the relation of part-
ners stand in the way of and prevent one partner from contract-
ing with the firm to perform any special employment or work
required by said firm for partnership purposes ?    We know of no
such law.    On the contrary, it has been held in this State, that
the mere relation of partners does not forbid a contract by one
partner with the firm, and that such contract, if *bona fide* and
free from fraud, will be sustained.    *Glenn* v. *Caldwell,* 4 *Rich.
Eq.,* 175.

· Next, what was the character of the relation of agency which
existed between these parties ?    It seems that Bowden and
Thompson were constituted a building committee when the com-
pany was first organized.    What were the precise duties of this
committee, does not appear in the testimony.    It only appears

that they were instructed at one time to advertise for bids, which duty they performed, in response to which several bids were made. These bids having been rejected as too high, this committee was instructed to make another effort. Upon this second call for bids, the defendants put in one, which was lower than any former bid, and lower than any made then. This bid was accepted. The agency of Bowden and Thompson in this matter consisted in getting bidders. In the performance of this duty, why could they not bid themselves, after opening the bidding to the public? We cannot see that the relation arising from this limited agency could of itself have prevented them from bidding openly and in their own name. And if under such circumstances such bid had been accepted, the contract certainly could have been enforced on both sides. We conclude, then, that the mere fact of the defendants being partners with and agents of the plaintiffs, would not be sufficient in themselves to sustain plaintiffs' claim.

But the question now arises, did the defendants act in good faith? Did they observe that fairness and fidelity to the common interest which the relation of partners and agents demanded at their hands? For while it may be true that partners and agents may not be absolutely precluded from dealing with the firm and the principal, yet such dealing is not entirely at arms' length, as may be the case with contracts between strangers. On the contrary, the utmost fairness is required. There should be no *suppressio veri* or *suggestio falsi*. The confidential relation which exists between such parties demands entire good faith and perfect frankness, and where these are absent, the contract should not be upheld; not so much on account of any actual fraud or injury which may have been committed, but because of opening the doors thereby and thereto. *Pars. Part.*, §§ 223 *et seq.*; *Pom. Eq. Jur.*, §§ 901 *et seq.*; *Story Eq. Jur.*, §§ 206 *et seq.*

Now, what are the facts of this case? Bowden and Thompson and Harris bid under a fictitious name, and they bid the exact amount which, from being members of the firm, they had learned the firm would ultimately be willing to give. Why did they conceal their own names? They must have had some purpose. They not only concealed their own names, but when the bid was presented, and the question was asked who composed Simmons & Co., they

replied that said firm was composed of responsible persons, thus leading their partners to suppose that they were outside parties. They must have concealed their names because they thought that the contract would not be awarded to them otherwise. And it was on motion of Thompson that they obtained the contract. They made the bid under a fictitious name, and then as members of the firm, in the meeting called to consider the bids, they used their influence to have their bid accepted. After this they sub-let the contract to Maxwell, Lyman & Land for $2,500 less than what they were to receive from the firm, by a contract which was a secret and expressly agreed to be kept secret. True, they afterwards informed the firm that they composed A. E. Simmons & Co., and obtained permission to have the contract made with these parties, Maxwell, Lyman & Land; but they still suppressed the fact that they were to retain the $2,500, and the contract was made out with Maxwell, Lyman & Land for $22,500.

If this building committee could make a contract for themselves at $20,000 with Maxwell, Lyman & Land, why could they not have made such a contract for the firm of which they were a part, and for whose common interest every member thereof, impliedly at least, was under obligation to work? The fact that these defendants made such an advantageous arrangement for themselves with Maxwell, Lyman & Land, so soon after they had obtained the contract, is a strong circumstance to show that, with a little effort on the part of the building committee, said arrangement might have been made with Maxwell, Lyman & Land for the firm in the first instance, when the first bids were returned with the request that the bidders might reduce their bids.

It seems that the firm never did learn directly from the defendants the true character of the contract between them and Maxwell, Lyman & Land. It "leaked out," however, as it is said, and notwithstanding this, the parties all continued to advance their proportion of the contract money at the $22,500; and this is claimed to have estopped the plaintiffs from questioning the transaction—which is the next question in the case. The ordinary doctrine of estoppel by conduct cannot apply here, for the reason that the defendants have in no way been injured, nor

induced to take action, nor put in any worse position by any act of the plaintiffs.

It is said, however, that there was a confirmation of the contract made with the defendants, and of the sub-letting thereof to Maxwell, Lyman & Land. This is true, and after this confirmation the plaintiffs were perhaps bound, so far as Maxwell, Lyman & Land were concerned, but this did not include the assignment by Maxwell, Lyman & Land of the $2,500. The contract to Maxwell, Lyman & Land was for $22,500, and the assignment was kept secret. This being utterly unknown, it cannot be said to have been then confirmed. Nor can the subsequent payments of their proportions by the different members have the effect of such confirmation. As we have said, they had consented to the transfer of the bid of the defendants to Maxwell, Lyman & Land, and by the contract made with these latter parties they had obligated themselves to pay the contract price, which was $22,500, and the continued payment of their proportion of that sum cannot be held as a confirmation of the arrangement made between Maxwell, Lyman & Land and the defendants. There is no evidence that any official information was ever given to the firm of this arrangement. Nor does it seem that it was known or suspected until the building was under way, and when it became known, although the parties continued to pay the assessments, dissatisfaction was expressed. We do not think that payment under these circumstances can operate as a confirmation.

It is the judgment of this court that the judgment of the Circuit Court be reversed, and that the case be remanded for such proceedings as may be required to enable the plaintiffs to recover six-ninths of $2,500, with interest from proper dates, to be ascertained by reference or otherwise, as by the Circuit Court may be deemed best.