GARY LEVINE et al., Respondents, v LAWRENCE LEVINE et al., Appellants, et al., Defendants.

First Department, December 1, 1992

**APPEARANCES OF COUNSEL**

*Peter M. Fishbein* of counsel, New York City (*Mark D. Godler* and *Jeffrey A. Fuisz* with him on the brief; *Kaye, Scholer, Fierman, Hays & Handler*, attorneys), for appellants.

*Stephen E. Powers* of counsel, New York City *(Elisabeth Seieroe Maurer* with him on the brief; *Fink Weinberger, P. C.,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J. P.

This appeal, from the denial of summary judgment dismissing those portions of the complaint seeking damages for the business decisions made by two real estate partnerships in which plaintiffs, the surviving wife and children of Albert Levine, who died in December 1983, and the defendants, Albert's brother, Lawrence, and his children, each collectively held a 25% interest, centers around the purchase and conversion of two apartment buildings by the brothers, Albert and Lawrence, who, for over 35 years, enjoyed a close and loyal relationship as partners in a real estate business founded by their father.

The business was originally limited to the management of residential property, but the brothers, in time, expanded it usually with the participation of outside partners, to include the purchase, improvement and sale of realty. When the conversion of residential buildings to cooperative ownership became the vogue, the brothers became involved in the process, setting up sponsors, helping effect offering plans and acting as the selling agent.

In 1979, the brothers' business, known as Dial Management Company, was reconstituted as Dial Services Co. with Albert's son, Gary, then, and until 1986, a school teacher, holding a 50% interest and Lawrence 50%. This arrangement was revised four years later, in May 1983, apparently at Lawrence's suggestion, to reduce Gary's interest to 49% and give Albert a 1% interest, purportedly so that Dial could collect sales commissions on cooperative conversions through Albert, who was an attorney. There was, however, no change in the way the business was operated. As always, the two brothers ran the business by themselves.

In 1980, Lawrence learned from his daughter, a resident in one of them, of an opportunity to purchase two apartment buildings in Great Neck. According to Lawrence, he negotiated a deal involving a relatively small risk to the brothers and the potential for a large return, in which they would sponsor the conversion of the buildings to cooperative ownership and finance their purchase with the proceeds from the

sale of the cooperative shares. Since the conversions were economically feasible only by the employment of an eviction plan, which he felt would be difficult to complete, Lawrence engaged the services of a well-known cooperative conversion attorney, who would be a 50% partner in two purchasing partnerships to be called Stonehenge Associates and Paris Associates. Ultimately, the attorney transferred half of his 50% interest to a third party. Albert was to have a one-half interest in Lawrence's 50% share of Stonehenge and Paris.

Since the transaction was to be structured in a way that the profits from Stonehenge and Paris were to be realized, not immediately but, rather, over a period of 20 to 30 years as the nonpurchasing tenants vacated their apartments, Albert and Lawrence decided that each of them would put his 25% interest in the names of his children. The brothers continued, however, as the actual functioning partners for their respective families. According to Lawrence, his son Dan was fully involved in the conversion process. Albert's son, Gary, attended the closings and signed the necessary documents on behalf of himself and his sisters. Otherwise, none of the children who, as the nominees of their fathers, were represented by Albert and Lawrence, respectively, were involved in the transactions at issue.

Each of the brothers thereafter put up $100,000, which was to be nonrefundable, as part of a $6,700,000 all-cash transaction. The sale did not have to be consummated for two and one-half years, during which the brothers would attempt to convert the buildings to cooperative ownership and, use the proceeds from the sales of the apartments to fund the purchase price, thereby avoiding the need to borrow. Thus, the $200,000 down payment was tantamount to an option to purchase. Since the success of the transaction depended on a large percentage of purchasing tenants, the conversion, as noted, called for an eviction plan, which, while requiring a larger percentage of tenants to vote for approval than in a noneviction plan, had the advantage of compelling the tenants, with the exception of senior citizens and the handicapped, to purchase or face eviction. The sale of the unsold shares, reflecting ownership of the unsold apartments, that is, those occupied by senior citizens or the handicapped, would, over time, as those tenants vacated their apartments or died, bring the profits.

For the plan to succeed, a substantial effort was required,

not the least of which involved the intensive lobbying of each tenant through a long and rigorous negotiation process. According to Lawrence, he and his son Dan performed the bulk of that work, as compensation for which the partners agreed that, rather than have Lawrence take a greater share in the partnership, Carodan Realty Co., owned by his three children, would receive, as selling agent, 6% of the purchase price from the sale of each of the apartments. According to Lawrence, Albert was fully aware of Carodan's existence, its purpose and the commissions it would receive. In that connection, it should be noted, the Stonehenge and Paris offering plans signed by Albert's son Gary, as representative of his family's side, identify Carodan as the selling agent for the apartments and Dan Levine as one of its principals. At the closing of the two buildings, attended by Gary, Carodan received a flat $100,000 commission, the payment of which was partially deferred, in lieu of the 6% commission on all prior apartment sales for the buildings. Carodan has also received approximately $73,000 in commissions from subsequent sales.

The negotiations with the tenants in the conversion process proved, as expected, to be time-consuming and difficult. The tenants rejected the initial offering price of $66 per share and challenged the adequacy of the proposed $25,000 reserve fund for each of the buildings. The final offer of $45 per share and reserve fund of $200,000, made with the full knowledge of all the participants, including Albert, was accepted. The tenants in the Stonehenge building, who took a more active role in the negotiations than did the tenants of the Paris building, who followed the lead of the former, voted to approve the final plan by one vote. Approximately 85% of the tenants purchased their apartments.

At the April 1983 closing, the money paid by the tenants for their apartments was immediately transferred to the original owner of the buildings in payment of the purchase price. The remaining shares, representing the unsold apartments, were issued to Stonehenge and Paris. Since, however, some subscribing tenants were unable to close timely on the purchase of their apartments, the proceeds from the sales of the purchasing tenants' apartments were insufficient to pay the balance due on the buildings' purchase price. To make up this deficit, Stonehenge had to take out a $1,000,000 bridge loan, the payment of which Albert and Lawrence and the two individual nonfamily partners personally guaranteed. That loan was satisfied six months after the April 1983 closing with

the proceeds from the sale of the apartments whose purchasers were not able to close before that time.

After Albert's death in December 1983 hostility between the brothers' families began to develop, fueled by the belief that Lawrence did not treat Albert's family fairly with respect to the various real estate ventures in which the brothers, as well as other unrelated parties, had been partners. As a result, most of these properties have had to be disposed of; Albert's family has received approximately $9,000,000 from sales and refinancings. Four years after the closing, Albert's family commenced the instant action, alleging, as against the Levine defendants, a breach of fiduciary duty in the course of negotiating the conversion of the Stonehenge and Paris properties to cooperative ownership. Specifically, they challenge a series of business decisions, which essentially fall within two categories, made by the partnerships in that process. Seven decisions, referred to as the "nonconflict decisions" because the economic impact of these decisions affected the Levine plaintiffs and the Levine defendants in precisely the same way, constitute all but one of plaintiffs' claims. In the second category is a single decision, i.e., to pay commissions to Carodan as the selling agent for the conversions.

With respect to the nonconflict decisions, plaintiffs attack the decisions to file the conversions as eviction rather than noneviction plans; the reduction of the per-share price charged to the tenants and the increase in the reserve fund for each building; the payment of approximately $25,000 in fees to the partnerships' accountants; the payment of $40,520 in settlement of a claim against Stonehenge by the cooperative corporation owned by the Stonehenge tenants, who alleged a failure to disclose certain facts regarding the mortgages on the building; the payment of $6,949.93 in penalties to settle a dispute concerning a New York State Gains Tax on Stonehenge and Paris and the payment of approximately $40,000 in legal fees to the partnerships' lawyers for services rendered in the normal course of business.

After joinder of issue and extensive discovery, the Levine defendants moved for summary judgment. Plaintiffs cross-moved for summary judgment and to compel an accounting. The IAS Court held, *inter alia*, that although it was beyond dispute that 75% of the partners (Dan Levine, his sisters and the nonfamily partners) consented to the challenged decisions and that Gary Levine signed the offering statements in which most of the information concerning these decisions was dis-

closed, plaintiffs should be given an opportunity to substantiate the charge that the decisions were "deliberately withheld from them", that their interests were never represented and that the purported ratification by Gary was "vitiated by the absence of full and fair disclosure". Although the court did not point to any conflict of interest between the Levine defendants and the Stonehenge and Paris partnerships with respect to the challenged decisions, it held that the business judgment rule would not apply if the Levine plaintiffs were excluded from participation in those decisions. The Levine defendants appeal from so much of the determination as denied them summary judgment with respect to plaintiffs' challenge of the Stonehenge and Paris business decisions in the course of the conversion process.

Not only have plaintiffs failed to allege negligent mismanagement with respect to these decisions, but they have also expressly disclaimed any reliance on such a theory of liability. Rather, their claim of wrongdoing is based solely on the charge that the Stonehenge and Paris partnerships breached a fiduciary duty owed them as partners. Under the business judgment rule, however, a fiduciary's business decisions "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of [the principal's] purposes" are beyond the scope of judicial scrutiny. *(Auerbach v Bennett*, 47 NY2d 619, 629; *see, Blaustein v Pan Am. Petroleum & Transp. Co.,* 293 NY 281, 303-304.) If the decision is made in good faith and without personal bias or conflict of interest, the fiduciary is not liable even if the decisions turn out to be unwise or unsound. While the business judgment rule is most frequently applied in actions against corporate directors for the breach of fiduciary duties owed to the corporation or its stockholders, its rationale applies equally to partners acting as fiduciaries for the partnership and the other partners. "There is no basis or warrant for distinguishing the fiduciary relationship of corporate director and shareholder from that of general partner and limited partner. The principle is the same—those in control of a business must deal fairly with the interests of the other investors and this is so regardless of whether the business is in corporate or partnership form." *(Lichtyger v Franchard Corp.,* 18 NY2d 528, 536.)

The seven nonconflict decisions, however, involve transactions in which the Levine defendants had no personal interest and there existed no conflict of interest between the partners.

Since the Levine plaintiffs and the Levine defendants, as partners, shared equally the benefits and burdens of these seven decisions, which, undisputably, were authorized—more than a majority of the partners having consented thereto (see, Partnership Law § 40 [8])—no conflict existed in their respective interests, and they were not negligently made or motivated by the Levine defendants' self-interest, plaintiffs' claims as to these transactions come down to nothing more than a challenge to their wisdom. In such circumstances, the Levine defendants should have been granted summary judgment.

Needless to say, the Levine defendants do not concede that the conversion process decisions made by the Stonehenge and Paris partnerships were incorrect. In that regard, they point to the success of the project. But the wisdom of the nonconflict decisions is not at issue here since each of them reflects that type of determination appropriately left to the partnerships' sound discretion and honest judgment, which is outside the purview of judicial inquiry. For instance, the decision to proceed with an eviction plan for the cooperative conversion is a classic business determination, made upon a consideration of all the circumstances, economic and practical, attending the transaction. Here, the opportunity to purchase a valuable piece of real estate at an investment of $200,000 with the balance to be funded by the proceeds of the conversion, without the need for costly financing, made the eviction plan method an extremely attractive one from a business viewpoint.

The partnerships' decisions, made in stages over the course of a rigorous two-year negotiation, to give concessions to the tenants—lowering the purchase price of the shares in the cooperative corporations and increasing the reserve funds—as an inducement to secure the required votes for approval of the plan is also a matter of business judgment. As the record shows, the negotiations were intense. The tenants were organized and disciplined. Until the final offer, they rejected each offering price. In its final form, the conversion plan was approved by only one vote. Thus, it seems clear, these concessions were essential if the conversion was to be effected.

With respect to the fees paid by the partnerships to their attorneys and accountants, $40,000 and $25,000, respectively, there is no showing that they were excessive or that they were not related to traditional professional services rendered in the normal course of business. Nor is there any claim that the Levine defendants benefited from the payment of the fees.

While one of the Stonehenge and Paris partners was also a partner in the law firm representing the partnerships, the issue is not whether that partner had a conflict in approving the legal fee but rather whether the Levine defendants had such a conflict. There is no indication of any conflict.

The other two nonconflict decisions at issue involved the partnerships' compromise and settlement of two claims, one a claim of nondisclosure by purchasing tenants and the other a claim for tax penalties. As to each, the partnerships, through brothers Albert and Lawrence and the two nonfamily partners, decided, as fiduciaries acting for a principal often do, that it was in the partnerships' best interests to settle rather than incur additional expense and run the risk of being subjected to a more substantial liability. For better or worse, these settlements affected all the partners equally. Thus, it cannot be argued that the Levine defendants received any special benefit. Since there is no conceivable conflict of interest, the decisions are protected.

■ In denying summary judgment as to the nonconflict decisions on the ground that plaintiffs were "frozen out", the IAS Court relied on Partnership Law § 40 (5), which provides that "[a]ll partners have equal rights in the management and conduct of the partnership business." Obviously, a partner cannot be excluded from the management and operation of the partnership's business. That, however, is not the case here. It is undisputed that the Levine plaintiffs never sought to be involved in the decision-making process or to be kept informed. Indeed, throughout the entire conversion process, they never made an inquiry of any of their partners with respect to the progress of the transaction, its likelihood of success or any of its details. Instead, they relied on the judgment of their father, who acted as their surrogate, to represent their interests. As Gary Levine, by his own admission, "quite ignorant about the co-oping process[ ]", testified, he chose "to monitor the situation through [his] father."

"[A]n agency may be implied from the parties' words and conduct as construed in light of the surrounding circumstances." (*Riverside Research Inst. v KMGA, Inc.,* 108 AD2d 365, 370, *affd* 68 NY2d 689.) While, as plaintiffs correctly note, "[t]he fact of agency or the extent of his powers may not be established by the representations of the agent" (*Bussing v Lowell Film Prods.,* 233 App Div 493, 495, *affd* 259 NY 593), the Levine plaintiffs themselves, by their own acts, not Albert's, clearly invested their father with the apparent author-

ity to represent the family's interest. They knew that the conversion process was proceeding apace, that the requisite decisions were being made for the partnership and that their father was involved in those decisions. They knew also, as did the Levine defendants, that their father had no interest of his own in the partnerships and thus was involved in the partnership decisions only as their representative. At no time prior to Albert's death did the Levine plaintiffs challenge any of the partnerships' decisions or in any way suggest that their father was not authorized to act in their behalf. Nor have they disputed Lawrence's assertion that Albert was representing his children in approving the partnership decisions as was Lawrence representing his.

Thus, there is no support for the suggestion that plaintiffs were intentionally frozen out of the partnerships' decisions. Moreover, as the record discloses, Gary Levine signed each offering plan, certified to its truthfulness, attended the closing and participated as a representative of the Levine plaintiffs' interests. In such circumstances, given Albert's involvement, the Levine defendants had no fiduciary obligation to involve the Levine plaintiffs further in the management of the partnerships.

Nor, contrary to plaintiffs' argument, would Lawrence's testimony about Albert's representation of his children's interest be barred by the "Dead Man's Statute" (see, CPLR 4519), which prohibits a party or a person "interested in the event" from being "examined as a witness in his own behalf or interest * * * against the executor, administrator or survivor of a deceased person * * * or a person deriving his title or interest from, through or under a deceased person * * * by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person." While, doubtless, such testimony would be against the interest of Albert's children, it would not be against the interest of his estate. Thus, the testimony is not barred. (See, Pomerantz v Sussman, 279 App Div 1019.) Nor are Albert's children persons "deriving [their] title or interest from, through or under" him since Albert never had any ownership interest in the two partnerships. Thus, his children's title or interest is not derived from him. (See, e.g., Ehrlich v American Moninger Greenhouse Mfg. Corp., 26 NY2d 255, 258.) The statute's prohibition is not triggered under the "deriving his title or interest" unless the title or interest belonged to the deceased during his or her lifetime and passed, by assignment or

otherwise, through the deceased to the party for whom the statute's protection is intended. *(Ward v New York Life Ins. Co.,* 225 NY 314, 319-320.) Albert never had a partnership interest in Stonehenge and Paris which passed to his children. Their interest arose when these partnerships were formed.

■ With respect to the claims based on the payment of commissions to Carodan, the selling agent in the conversion process, owned by Lawrence's children and operated by his son Dan, we agree that summary judgment would be inappropriate. Plaintiffs claim that Carodan has received over $300,000 in selling commissions, while its principal, defendant Dan Levine, was on the payroll of Dial, using its facilities and employees to carry out Carodan's activities. In effect, plaintiffs claim that Dial paid all of Carodan's business expenses as the selling agent for the Stonehenge and his properties, including Dan Levine's salary, while the commissions went to Carodan. Moreover, it is claimed that the payments of commissions on the Stonehenge and Paris sales to Carodan after Albert's death were hidden from scrutiny in the financial statements supplied to Gary. Since the Carodan matter is distinguishable from the nonconflict decisions, the impact of which falls equally and indiscriminately on all the partners, we find an issue of fact as to the claim that there has been a siphoning off of partnership assets to benefit one side of the family, the Levine defendants. Our disposition of this issue is, of course, somewhat influenced by the fact that Albert, whose testimony on this point would be essential, is no longer available. There is, at the very least, despite Lawrence's explanation, a question as to why those services were not performed by Dial, in which each of the Levine factions had an equal interest.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered November 21, 1991, which, *inter alia,* denied the Levine defendants' motion for summary judgment dismissing the complaint as to them, should be modified, on the law, to grant said motion to the extent of dismissing the claims with respect to the nonconflict decisions and, except as thus modified, affirmed, without costs or disbursements.

CARRO, MILONAS and KUPFERMAN, JJ., concur.

Order of the Supreme Court, New York County, entered on or about November 21, 1991, which, *inter alia,* denied the

Levine defendants' motion for summary judgment dismissing the complaint as to them, is modified, on the law, to grant said motion to the extent of dismissing the claims with respect to the nonconflict decisions and, except as thus modified, affirmed, without costs or disbursements.