538 S.E.2d 15

Henry KUZNIK, Plaintiff,

v.

BEES FERRY ASSOCIATES, A South Carolina Partnership and Howard E. Hoffman, Defendants.

Howard E. Hoffman, Third–Party Plaintiff,

v.

Bees Ferry Associates, A South Carolina Partnership, Hilton Head Equity Management Co., Inc., Greenbax Enterprises, Inc., G. Harris Thaxton, David Rawle, Edward L. Henning, Frances R. Finch, L. Joseph Land, Evan D. Jones, and Brumley/McKinney/Meyer, Third–Party Defendants,

of whom Bees Ferry Associates, A South Carolina Partnership, Hilton Head Equity Management Co., Inc., Greenbax Enterprises, Inc., G. Harris Thaxton, David Rawle, Edward L. Henning, Frances R. Finch, L. Joseph Land, Evan D. Jones, and Brumley/McKinney/Meyer are, Appellants–Respondents,

and

Howard E. Hoffman is, Respondent–Appellant.

No. 3242.

Court of Appeals of South Carolina.

Heard Aug. 30, 2000.

Decided Sept. 25, 2000.

Rehearing Denied Dec. 16, 2000.

582

584

G. Dana Sinkler and Andrea H. Duenas, both of Warren & Sinkler; Michael A. Scardato, of McNair Law Firm, all of Charleston; and Robert L. Widener, of McNair Law Firm, of Columbia, for appellants/respondents.

Harold A. Oberman and Marvin I. Oberman, both of Oberman & Oberman; and A. Arthur Rosenblum, all of Charleston, for respondent/appellant.

ANDERSON, Judge:

Bees Ferry Associates, a general partnership, appeals from the Master's finding that it breached its fiduciary duty to Hoffman and breached the partnership agreement. Howard Hoffman cross appeals from the Master's order dismissing his

causes of action under the Uniform Limited Partnership Act, S.C.Code Ann. §§ 33–42–10 to –2040 (1990 & Supp.1999) and for civil conspiracy. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

In 1987, Eric Meyer, a real estate broker with the Brumley Company,[1] approached Henry Kuznik about the possibility of purchasing a tract of land owned by Kuznik located along Bees Ferry Road in Charleston County. Meyer represented Howard Hoffman. Kuznik agreed to sell the land for $50,000 per acre and Hoffman decided to purchase the property.

Meyer and the Brumley Company helped negotiate the terms of the purchase. During negotiations, Meyer asked Hoffman if he would be willing to allow a real estate partnership to participate in the purchase. Hoffman agreed and the purchase was structured to permit Hoffman to assign the property to a general partnership Meyer helped form. In exchange for the assignable option, Hoffman agreed to remain personally liable to Kuznik for the mortgage and note, which were needed to finance the purchase, should the Partnership default. The Partnership became known as Bees Ferry Associates ("the Partnership").[2] Hoffman obtained a 12.5 percent interest in the Partnership in consideration of the assignment of the contract for the sale of the property and his personal guaranty of the purchase money note to Kuznik.

The purpose of the Partnership was to develop and eventually lease or sell the property. On November 11, 1988, the land was purchased in the Partnership's name. The Brumley Company earned an $80,000 commission from the sale.

The Partnership executed a seven-year purchase money mortgage and note for one million nine-hundred eighty-thousand five-hundred dollars ($1,980,500) to Kuznik. It additionally signed a mortgage and note to South Carolina National

---

1. The Brumley Company is a real estate development corporation.

2. In addition to Hoffman, the partners were: Frank Brumley, Eric Meyer, Patrick McKinney, David Carr, Frances Finch, Greenbax Enterprises, Inc., Edward Manning, Hilton Head Equity Management Co., Inc., Evan Jones, Joseph Land, David Rawle, and Harris Thaxton.

Bank for eight-hundred twenty-five thousand dollars ($825,-000) under the contract.

Frank Brumley, Patrick McKinney, and Meyer did not contribute any capital. They became managing partners. The other partners with the exception of Hoffman became "capital partners." Every year a "capital call" went out to the "capital partners" advising them of their percentage payment due to cover their portion of the note and mortgage.

In 1993, the Partnership mistakenly believed the Kuznik note was due and drew up a modification agreement to extend it. Brumley, McKinney, and Meyer signed the proposed modification agreement on behalf of the Partnership. The Partnership subsequently discovered the note was for seven years rather than five years.

The Partnership made payments on the note through October 1996. However, at that time, the partners became increasingly dissatisfied with the Bees Ferry property. "They had hoped that greater development would have occurred at that end of town." Meyer testified at trial the property wasn't appreciating as desired and it was no longer to the Partnership's benefit to continue making payments.

At the October 1996 meeting, a majority of the partners decided to cease payments on the note and mortgage. Hoffman was not present at the meeting.

Kuznik sent a right to cure letter offering to let the Partnership pay interest only and delay payment of the balance if it continued to make payments. The Partnership did not accept this offer. Consequently, Kuznik filed suit against Hoffman individually and against the Partnership. In the action, Kuznik sought foreclosure of the Bees Ferry mortgage and a personal deficiency judgment against Hoffman on the note. The Partnership currently owns sixteen acres of land (Tract I) and has no debt. The land is valued at approximately one million four hundred thousand dollars ($1,400,000).

The Partnership answered admitting Kuznik had the right to foreclose on the mortgage. Hoffman counterclaimed against Kuznik and filed third party complaints against the Partnership and each partner individually. In the complaints, Hoffman alleged breach of contract, breach of fiduciary duty,

fraud, civil conspiracy, and violation of the South Carolina Uniform Limited Partnership Act. By way of relief, Hoffman sought indemnity and an accounting. Hoffman subsequently dropped his counterclaim against Kuznik and proceeded against the Partnership and individual partners. The case was referred to a Master on May 30, 1997.

The Master granted Kuznik a deficiency judgment against Hoffman and ordered a foreclosure sale of the property. The Master additionally dismissed Hoffman's fraud and Uniform Limited Partnership Act causes of action and determined Hoffman did not establish a cause of action for civil conspiracy. He did, however, rule the partners and the Partnership: (1) breached the partnership agreement; (2) breached their fiduciary duty owed to Hoffman; and (3) must indemnify Hoffman.

The Partnership and the partners appeal the Master's findings regarding breach of the partnership agreement and breach of the fiduciary duty owed Hoffman. Hoffman cross appeals the Master's rulings on his causes of action for civil conspiracy and violation of the South Carolina Uniform Limited Partnership Act.

### *ISSUES*

I. Did the Master err in ruling the debt was an obligation of the Partnership?

II. Did the Master err in finding the partners did not have the authority to discontinue payments under the partnership agreement?

III. Did the Master err in finding the partners liable for breach of contract for failing to continue to make payments on the promissory note according to the partnership agreement?

IV. Did the Master err in determining the partners breached their fiduciary duty to Hoffman by discontinuing the payments on the promissory note?

V. Was the decision by the partners to discontinue payment on the promissory note protected by the business judgment rule?

VI. Was Hoffman entitled to contractual indemnity under the partnership agreement for the loss he will sustain in fulfilling the deficiency judgment?

VII. Was Hoffman entitled to recovery under equitable subrogation as a guarantor?

VIII. Did the Master err in dismissing Hoffman's claim for civil conspiracy?

IX. Was Hoffman entitled to punitive damages as a result of the partners' actions?

## STANDARD OF REVIEW

█ A case with legal and equitable issues presents a divided scope of review. *Perry v. Heirs at Law and Distributees of Gadsden,* 313 S.C. 296, 437 S.E.2d 174 (Ct.App.1993). When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal. *Corley v. Ott,* 326 S.C. 89, 485 S.E.2d 97 (1997).

█ "An action for breach of fiduciary duty is an action at law and the trial judge's findings of fact will be upheld unless without evidentiary support." *Id.; Future Group, II v. Nationsbank,* 324 S.C. 89, 478 S.E.2d 45 (1996). An action seeking damages for breach of contract is also an action at law and the trial judge's findings of fact will be upheld unless without support. *Brown v. Allstate Ins. Co.,* 337 S.C. 499, 523 S.E.2d 807 (Ct.App.1999).

█ "Indemnity is that form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party. A right to indemnity may arise by contract (express or implied) or by operation of law as a matter of equity between the first and second party." *Town of Winnsboro v. Wiedeman–Singleton, Inc. (Winnsboro I),* 303 S.C. 52, 56, 398 S.E.2d 500, 502 (Ct.App.1990), *aff'd,* 307 S.C. 128, 414 S.E.2d 118 (1992) (*Winnsboro II* ) (citation omitted).

[5] "In an action at law, on appeal of a case tried without a jury, *the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which*

*reasonably supports the judge's findings.* The rule is the same whether the judge's findings are made with or without, a reference. The judge's findings are equivalent to a jury's findings in a law action. *Chapman v. Allstate Ins. Co.,* 263 S.C. 565, 211 S.E.2d 876 (1975)." *Townes Assocs. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976) (emphasis added).

 Subrogation can arise by statute, by contract, or through equity. *Dailey v. Secura Ins. Co.,* 164 Wis.2d 624, 476 N.W.2d 299 (Ct.App.1991). Conventional subrogation arises by contract and is specifically bargained for by the parties. In contrast, equitable (or legal) subrogation is implied subrogation that arises under the common law. *Shumpert v. Time Ins. Co.,* 329 S.C. 605, 496 S.E.2d 653 (Ct.App. 1998).

We note the parties conceded this is an action at law.

## *LAW/ANALYSIS*

### I. The Partnership's Obligation to Make Payments

 The Partnership contends the promissory note was not an obligation of the Partnership due to its status as nonrecourse to the Partnership and partners. We disagree.

The evidence demonstrates the Partnership signed a note obligating it to make payments on the property. The note stated:

> For value received, the undersigned, *Bees Ferry Associates, a South Carolina Partnership* (hereinafter sometimes referred to as the "Borrower"), *promises to pay to the order of HENRY KUZNIK,* c/o Henry's Construction Company, 2117 Savannah Highway, Charleston, South Carolina 29407 (sometimes hereinafter referred to as the "Lender"), his successors, heirs and assigns, the principal sum of One Million Nine Hundred Eighty Thousand Five Hundred ($1,980,500.00) Dollars, with interest thereon, or on those amounts remaining unpaid from time to time, from the date hereof at a rate of interest per annum. . . .

(Emphasis added).

Further evidence of the Partnership's duty to pay is the capital call letters sent to the partners describing the loan as

"the Bees Ferry Associates Partnership loan to the purchase money holder, Henry Kuznik." The capital call letters further characterize the interest payment on the loan as "due and payable."

A financial statement of the Partnership's activity indicates the Partnership bought land in November of 1988. The loan appeared on both the Partnership's and the partners' income tax statements as a liability. The Partnership listed the debt on its balance sheet and paid taxes on the land.

The mortgage the Partnership obtained to pay the above promissory agreement demonstrates the Partnership's duty to make payments. The mortgage contract pronounces:

Whereas, *the said Bees Ferry Associates, a South Carolina Partnership[,] stands firmly held and bound unto Henry Kuznik, in the principal sum of One Million Nine Hundred Eighty Thousand Five Hundred and $^{00}/_{100}$ ($1,980,500.00) Dollars as evidenced by a certain promissory note* bearing even date herewith, made payable and delivered to the mortgagee-obligee, wherein the mortgagor-obligor agreed to pay the same with interest thereon, according to the terms of said promissory note, to which reference is specifically made.

(Emphasis added).

The mortgage further proclaims,

NOW, KNOW ALL MEN, that the said *BEES FERRY ASSOCIATES* in consideration of the said debt and sum of money aforesaid, and for the better securing the payment thereof to the said HENRY KUZNIK, according to the condition of the said Note; and also in consideration of the further sum of Three Dollars to it, the said BEES FERRY ASSOCIATES in hand well and truly paid by the said HENRY KUZNIK, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold and released, and by these presents, does grant, bargain, sell and release unto the said HENRY KUZNIK, his successors, heirs and assigns, the following described property, to wit:

All those two certain pieces, parcels or tracts of land, situate, lying and being to the North of Savannah Highway—US 17 South, to the west of Main Road and to the

south of Bees Ferry Road in St. Andrews Parish in the County of Charleston, State aforesaid, shown and delineated as Tract II 11.19 Ac and Tract III Residual 32.42 Ac. . . .

William Schools, the president of Greenbax, testified Greenbax paid capital calls on the Kuznik mortgage because the calls were an obligation. Additionally, the Partners paid their capital calls until the time of default, and the Partnership partly performed the above agreements.

John Warren, the attorney for the Partnership, testified during examination by the court:

Q. But the primary maker on the note was the partnership?

A. That's correct.

Q. So that is an obligation of the partnership, is it not?

A. To the extent that that nonrecourse note was an obligation of the partnership, that's right.

 . . . .

Q. But it was an obligation of the note, was it not, of the partnership?

A. An obligation in the sense, that, yes, it would have been a debt of theirs[.]

Q. They agreed to pay somebody money; that's an obligation.

A. That's right. But, that promise was not enforceable if they gave the property back at any time.

We find the evidence shows the Partnership had an obligation to make payments to Kuznik. Hoffman's continuing personal liability on the note merely limited the relief Kuznik could seek from the Partnership in the event of default—"the Lender agrees that no recourse shall be had for the payment of any sums due under this Note. . . ." The note was nonrecourse to the partners and the Partnership. While this may have removed the economic incentive for the Partnership to make the payments, it did not remove the contractual obligation. This limitation did not affect Hoffman's ability to seek relief from the Partnership in the event of default. The Master's conclusion the Partnership had an obligation to make payments on the property is supported by the evidence in the record.

## II. Partnership's Authority to Default on Payments under the Partnership Agreement

The Partnership asserts the partners had authority under the partnership agreement to default on the payments for the promissory note and allow the property to be taken in forfeiture. We disagree.

The Master's factual determinations included: (1) "the purpose of the partnership was to purchase the property from Kuznik for $3,000,000.00;" and (2) "the partnership agreement does not contain authority to dispose of partnership assets by allowing them to go into foreclosure." The Master concluded:

While section 12.2(a) does give to the partners the right to "dispose" of property, it would be an absurd construction to state this language implies the partners have the "right" to "dispose" of property by allowing it to be sold under foreclosure.... Common sense and good faith are the leading touchstones of the construction of a contract and contracts are to be so construed as to avoid an absurd result. *Georgetown Manufacturing and Warehouse Company v. South Carolina Department of Agriculture,* 301 S.C. 514, 392 S.E.2d 801 (Ct.App.1990).

This Court has held:

Common sense and good faith are key principles of construction of the provisions of a contract. In construing terms of a contract, the reviewing court must look at the language of the contract to determine the intentions of the parties. When the language of the contract is clear, explicit and unambiguous, it must be taken and understood in its plain, ordinary, and popular sense. *C.A.N. Enters., Inc. v. South Carolina Health & Human Serv. Fin. Comm'n,* 296 S.C. 373, 373 S.E.2d 584 (1988).

*Goode v. St. Stephens United Methodist Church,* 329 S.C. 433, 445, 494 S.E.2d 827, 833 (Ct.App.1997).

In *C.A.N. Enterprises, Inc., supra,* the Supreme Court reasoned: "Common sense and good faith are the leading touchstones of construction of the provisions of a contract; where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed, would make it reasonable, fair and just, the latter construction must prevail." *Id.* at 377,

373 S.E.2d at 586 (citing *Farr v. Duke Power Co.*, 265 S.C. 356, 218 S.E.2d 431 (1975)).

The partnership agreement provided:

*Section 12.2. Authorization:* It shall be necessary for Partners holding seventy-five (75%) percent of the capital interest in the Partnership to consent to any act or execute any document or enter into any contract or any agreement of any nature necessary or desirable, *in pursuance of the purposes of the Partnership,* including, without limitation, the authority:

(a) To *acquire, hold, lease, and dispose of the Property* or any portion thereof or interest therein or appurtenant thereto, as well as personal or mixed property connected therewith, including the purchase, trade or sale of such properties;

(b) To borrow money and, if security is required therefor, to mortgage or subject to any other security device, the Property or any portion thereof or obtain replacements for any mortgage, security deed, or other security device, and to prepay, in whole or in part, increase, modify, consolidate, or extend any mortgage, security deed or other security device;

(c) To place record title to, or the right to use, Partnership assets in the name of names of a nominee or trustee;

(d) To acquire and enter into contracts of insurance, guaranty or surety, which may be necessary and proper for the protection of the Partnership, for the conservation of its assets, or for any purpose convenient or beneficial to the Partnership;

(e) To employ, engage or contract with persons in the operation and management of the Partnership business, including, but not limited to, supervisory managing agents, insurance brokers, real estate brokers, and loan brokers; and

(f) To execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

(Emphasis added).

The agreement defines the *raison d'etre* of the Partnership in § 3.1:

*Section 3.1. Purpose of the Partnership:* The business of the Partnership shall be to acquire, hold, improve, develop, sublease, and/or sell, in whole or in part the Property or to participate in the owning, leasing, holding, mortgaging subleasing, selling, improvement and managing of the Property and any other purposes as are necessary to protect or enhance the assets of the Partnership.

The partners concurred that the purpose of the Partnership was to acquire, develop, and sell the property.

The partners did not have the authority to cease making payments on the loan. An examination of the contract reveals the Partnership was created to "acquire, hold, improve, develop, sublease, and/or sell, in whole or in part the Property or to participate in the owning, leasing, holding, mortgaging, subleasing, selling, improvement and managing of the Property and any other purposes as are necessary to protect or enhance the assets of the Partnership." Nowhere does the agreement state the partners may decide to divest the Partnership of its assets by permitting them to be sold in foreclosure. Foreclosure of Partnership assets does not promote the Partnership's established purposes.

### III. Breach of Partnership Agreement

 Hoffman maintains the partners breached the partnership agreement by failing to pay their capital calls. We agree.

The partnership agreement required all capital partners to pay capital calls to cover expenses of the Partnership, including taxes and interest on the note from Kuznik. The agreement reads:

*Section 7.1. Capital Calls:* Each partner other than Howard Hoffman and Brumley/McKinney/Meyer ***shall pay capital calls*** pursuant to this agreement in that proportion which the capital interest of each Partner bears to the total capital interest of Partners responsible for capital calls. Howard Hoffman and Brumley/McKinney/Meyer shall not be responsible for capital calls.

(Emphasis added).

The managing partners, Brumley/McKinney/Meyer, notified the capital partners on October 7, 1996 of the amount of their

capital call, and requested a meeting to discuss the direction of the Partnership. The memo to one of the partners, Ned Payne, states, in pertinent part:

> We are at an important time in the determination of our long term business strategy for our investment at Bees Ferry Road and Highway 17S. I think it would be appropriate to have a partnership meeting to discuss our direction. On November 10[th], we have interest due on the Kuznik note in the amount of $158,440.00. As in past years, it will be necessary to have a capital call to pay this amount and I would like to have some consensus on where we are going. Your pro rata share of the capital call would be $21,120.

The Master found this was a capital call, obligating the capital call partners for their appropriate share. The partners argue there was no capital call issued. We disagree with the partners' assertion.

The memo references the amount of the partners' responsibility toward the capital call. While it does reference the need for a meeting, the capital call partners were informed of their obligation. Several of the partners sent their payments for the capital calls after receiving the memo. These payments were later returned by Brumley/McKinney/Meyer. The Master correctly concluded the memo was a capital call.

Once the request for payment of the capital calls was issued, the partners were obligated to make payment. Section 7.1 of the partnership agreement says: "Each partner . . . *shall pay capital calls.*" (Emphasis added). There is no evidence showing any of the partners, with the exception of Carr, were financially unable to make payment. Carr stood alone in refusing to join in the vote to cease honoring the capital calls. We find the evidence validates the Master's decision that the partners' (with the exception of Carr) failure to pay the October capital call was a breach of the Partnership agreement.

### IV. Breach of Fiduciary Duty

#### A. Fiduciary Duty in South Carolina

Renowned jurist, Justice Cardozo, characterized the duty owed by partners in the often quoted *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928):

Joint adventurers, like copartners, *owe to one another,* while the enterprise continues, *the duty of the finest loyalty.* Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Meinhard,* 164 N.E. at 546 (emphasis added) (citations omitted).

According to 59A Am.Jur.2d *Partnership* § 410 (1987):

One of the paramount duties of partners among themselves, if not the primary duty, is their fiduciary duty, universally recognized as including a duty to exercise good faith and maintain the highest integrity in dealing with other partners.

Section 420 continues:

The courts universally recognize the fiduciary relationship of partners and *impose on them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs.* It is a fundamental characteristic of partnership that the partners' relationship is one of *trust and confidence* when dealing with each other in partnership matters.

Partners are held to a standard stricter than the morals of the marketplace, and their fiduciary duties should be broadly construed, connoting not mere honesty but the punctilio of honor most sensitive. In all matters connected with the partnership every partner is bound to act in a manner not to obtain any advantage over his copartner in the partnership affairs by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. *A partner cannot*

*act too quickly to protect his own financial position at the expense of his partners, even in the absence of malice.*

59A Am.Jur.2d *Partnership* § 420 (1987) (emphasis added) (footnotes omitted).

South Carolina recognizes the fiduciary duty owed between partners:

The law holds each member of a partnership to the *highest degree of good faith* in his dealings with reference to any matter which concerns the business of the common engagement, and each partner, being the agent of the firm, must be held to the same accountability as other trustees, in all matters which affect the common interest. The relationship of a partnership is fiduciary in character and imposes on the members the obligation of refraining from taking any advantage of one another by the slightest misrepresentation or concealment.

*Lawson v. Rogers,* 312 S.C. 492, 498–499, 435 S.E.2d 853, 857 (1993) (emphasis added) (citations omitted).

Under the cases decided by this Court, the partners are treated as fiduciaries each to the other and characterizes their relationship as one of mutual trust and confidence, imposing upon them the usual trust requirements of loyalty, good faith and fair dealing. *Whitman v. Bowden,* 27 S.C. 53, 2 S.E. 630 [1884]; *Price v. Middleton,* 75 S.C. 105, 55 S.E. 156 [1906]; and *Badder v. Saleeby,* 131 S.C. 101, 126 S.E. 438 [1924].

*Few v. Few,* 239 S.C. 321, 336, 122 S.E.2d 829, 836 (1961).

This duty is further detailed in S.C.Code Ann. § 33–41–540 (Supp.1999):

(1) Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

Apodictically, the partners of Bees Ferry stood in a fiduciary relationship with Hoffman. They therefore owed him the duty of good faith and a highest loyalty.

## B. Business Judgment Rule Generally

The partners and the Partnership claim their actions are protected under the business judgment rule. We disagree.

The business judgment rule has been utilized in South Carolina to protect corporate directors:

> Under the business judgment rule, a court will not review the business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith.

*Dockside Ass'n, Inc. v. Detyens,* 291 S.C. 214, 217, 352 S.E.2d 714, 716 (Ct.App.1987), *aff'd,* 294 S.C. 86, 362 S.E.2d 874 (1987) (citing H. Henn, *Law of Corporations* § 242 (2d ed. 1970)). *See also Goddard v. Fairways Dev. Gen. Partnership,* 310 S.C. 408, 426 S.E.2d 828 (Ct.App.1993) (in a dispute between directors of homeowners association and aggrieved homeowners, conduct of directors should be judged by the business judgment rule and absent showing of bad faith, dishonesty, or incompetence, judgment of directors will not be set aside by judicial action); *Seabrook Island Property Owners Ass'n v. Pelzer,* 292 S.C. 343, 356 S.E.2d 411 (Ct.App.1987) (the business judgment rule applies to *intra vires* action of corporation, not to *ultra vires* acts).

South Carolina has codified a similar rule in S.C.Code Ann. § 33–8–300 (Supp.1999), as the standard of review for the decisions made by corporate directors and officers:

> (a) A director shall discharge his duties as a director, including his duties as a member of a committee:
>
> (1) in good faith;
>
> (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>
> (3) in a manner he reasonably believes to be in the best interests of the corporation and its shareholders.

The business judgment rule requires directors to act reasonably and in good faith. It does not expect perfection. However, the rule will ***not*** apply if the directors have engaged in ***self-dealing,*** fraud, or other unconscionable conduct. *See Dockside Ass'n, Inc. v. Detyens,* 294 S.C. 86, 362 S.E.2d 874 (1987) (business judgment rule precludes judicial

review of actions taken by corporate governing board absent showing of lack of good faith, fraud, self-dealing or unconscionable conduct) (citing *Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516, 401 A.2d 280 (1979)).

## C. Business Judgment Rule as Applied to Partnerships

The opportunity has not arisen in South Carolina to apply the business judgment rule to partnerships. In *Anthony v. Padmar*, 320 S.C. 436, 465 S.E.2d 745 (Ct.App.1995), this Court mentions the possible application of the business judgment rule to limited partnerships. However, the issue was not before this Court because the trial court reviewed the decision under a strict fiduciary duty standard and the general partners did not appeal. This Court cited several other states in a footnote:

> Courts from other jurisdictions have variously applied the fiduciary duty, the business judgment rule, and breach of contractual duty standards to the conduct of a general partner vis-a-vis his limited partners. 59A Am.Jur.2d *Partnership* § 1335 *et seq.* (1987); *see Wyler v. Feuer*, 85 Cal.App.3d 392, 149 Cal.Rptr. 626 (1978) (applied the business judgment rule); *Roper v. Thomas*, 60 N.C.App. 64, 298 S.E.2d 424 (1982) (refused to apply the business judgment standard to the actions of general partners because the duties of the general partners were set out in the partnership agreement, and general partners clearly breached those duties); *Appletree Square I Limited Partnership v. Investmark, Inc.*, 494 N.W.2d 889 (Minn.Ct.App.1993) (applied strict fiduciary standard); *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 635 A.2d 798 (1994) (applied a modified fiduciary standard so that the determinative consideration was whether the general partners dealt fairly with the limited partners).

*Padmar*, 320 S.C. at 448 n. 7, 465 S.E.2d at 752 n. 7.

Other states have compared limited partnerships to corporations to determine the general partner should have protection from liability:

> A limited partnership affords a vehicle for capital investment whereby the limited partner restricts his liability to the amount of his investment in return for surrender of any

right to manage and control the partnership business. In a limited partnership the general partner manages and controls the partnership business. In exercising his management functions the general partner comes under a fiduciary duty of good faith and fair dealing toward other members of the partnership.

These characteristics limited investor liability, delegation of authority to management, and fiduciary duty owed by management to investors are similar to those existing in corporate investment, where it has long been the rule that directors are not liable to stockholders for mistakes made in the exercise of honest business judgment or for losses incurred in the good faith performance of their duties when they have used such care as an ordinarily prudent person would use. By this standard a general partner may not be held liable for mistakes made or losses incurred in the good faith exercise of reasonable business judgment.

*Wyler v. Feuer,* 85 Cal.App.3d 392, 149 Cal.Rptr. 626, 632–33 (1978).

Few cases have dealt with the application of the business judgment rule to general partnerships. While the extension to limited partnerships is reconciled by their similarity to a corporation's structure, the same does not hold true for general partnerships. Several jurisdictions have, nonetheless, extended the business judgment rule to protect the decisions made by general partners.

In *Bane v. Ferguson,* 890 F.2d 11 (7th Cir.1989), the Court of Appeals applied Illinois law to a law firm partnership. A lawsuit was brought against partners in the law firm's managing council for breach of fiduciary duty based on its actions resulting in the termination of the retirement plan. The court announced:

A partner is a fiduciary of his partners, but not of his former partners, for the withdrawal of a partner terminates the partnership as to him.... Even if the defendants were fiduciaries of the plaintiff, moreover, the business-judgment rule would shield them from liability for mere negligence in the operation of the firm, just as it would shield a corpora-

tion's directors and officers, who are fiduciaries of the shareholders.

*Bane,* 890 F.2d at 14.

In *Levine v. Levine,* 184 A.D.2d 53, 590 N.Y.S.2d 439 (1992), the parties were partners in real estate partnerships. One group of partners alleged a breach of fiduciary duty in the course of negotiating the conversion of the partnership's property to cooperative ownership. The court enunciated:

> Rather, their claim of wrongdoing is based solely on the charge that the Stonehenge and Paris partnerships breached a fiduciary duty owed them as partners. Under the business judgment rule, however, a fiduciary's business decisions "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of [the principal's] purposes" are beyond the scope of judicial scrutiny.... If the decision is made in good faith and without personal bias or conflict of interest, the fiduciary is not liable even if the decisions turn out to be unwise or unsound. While the business judgment rule is most frequently applied in actions against corporate directors for the breach of fiduciary duties owed to the corporation or its stockholders, *its rationale applies equally to partners acting as fiduciaries for the partnership and the other partners.*

*Levine,* 590 N.Y.S.2d at 443 (emphasis added) (citations omitted).

The Supreme Judicial Court of Massachusetts addressed the application of the business judgment rule to a partnership in *Starr v. Fordham,* 420 Mass. 178, 648 N.E.2d 1261 (1995). In that case, a withdrawing partner of a law firm brought suit against the remaining partners for breach of fiduciary duty relating to their calculation of his share of the year's profits. The court explicated the rule:

> The founding partners argue next that the judge erred in concluding that the business judgment rule does not preclude judicial review of their determination of the plaintiff's share of the 1986 profits. There was no error.
>
> *The test to be applied when one partner alleges that another partner has violated his duty of strict faith is whether the allegedly violating partner can demonstrate a legitimate business purpose for his action. Neverthe-*

*less, the business judgment rule does not apply if the plaintiff can demonstrate self-dealing on the part of the allegedly wrongdoing partner.* Having properly concluded that the founding partners had engaged in self-dealing when they assigned to the plaintiff his share of the profit, the judge made no error in concluding that the business judgment rule did not apply to the founding partners' actions. *Fordham*, 648 N.E.2d at 1265–66 (emphasis added) (citations omitted).

 We conclude the business judgment rule may apply to partnerships in South Carolina. When a partner alleges another has violated his fiduciary duty, the allegedly violating partner must show he acted: (1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the partner reasonably believes to be in the best interests of the partnership. However, the rule will *not* apply if the partners have engaged in *self-dealing, fraud, or other unconscionable conduct.* *See Dockside Ass'n, Inc. v. Detyens*, 294 S.C. 86, 362 S.E.2d 874 (1987) (citing *Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516, 401 A.2d 280 (1979)); *Fordham, supra;* 59A Am.Jur.2d *Partnership* § 443 (1987) ("[A partner] must refrain from taking any advantage of another partner by the slightest adverse conduct of any kind. A partner may not engage in self-dealing for his own benefit to the exclusion of his partners in respect to matters within the scope of the partnership enterprise and within the particular purpose of the partnership.").

## D. Application of Business Judgment Rule in This Case

 We have determined the business judgment rule may apply to partnerships, thus eliminating judicial review of business decisions in the best interest of the partnership if they are made in good faith and with the care of an ordinarily prudent person. The Partnership avers its decision to default on the loan to Kuznik was in its best interest and, therefore, is not subject to review under the business judgment rule. We disagree.

The Partnership argues by defaulting on the loan, the Partnership was able to save large amounts of money in

interest and principal payments, for which it would never receive a profitable return:

At the time of the decision to discontinue payments, the partnership had paid a total of $2,325,206. To pay off the Kuznik note required an additional payment of $2,138,940, comprised of [$]1,980,500 (the face value of the note) and $158,440 (the 8% interest due in November, 1996), raising the total investment in the property to $4,464,146. The property had a total value of $2,850,000. Thus, paying off the note would have yielded a net loss of $1,614,146 to the partnership.

As a result of the decision to discontinue payments on the note and mortgage, the cost of the property was fixed at $2,325,206. The partnership owned Tract 1, valued at $1,400,000. Thus, discontinuing the note and mortgage payments reduced the partnership's loss position to $925,-206, a savings of $688,940.... [C]ontrary to the Master's Order, this benefitted the partnership.

While we understand how the default on the note benefitted the capital partners, it was done at the detriment of one of the other partners, Hoffman. The Master found the decision to default and allow the property to enter foreclosure was self-serving and unconscionable. The evidentiary record buttresses the decision of the Master.

The capital call partners have a direct interest in how much money they will be forced to pay Kuznik on the promissory note. The capital call partners were responsible for paying the interest and principal on the promissory note. In return, their profits would come only after the property was developed and/or sold. Thus, the capital call partners had some self-interest in defaulting on the promissory note and allowing the property to enter foreclosure, as opposed to continuing to make payments on the note.

Knowing that the note was nonrecourse, Kuznik's only avenue was foreclosure and enforcement of a deficiency judgment against Hoffman. The capital call partners would suffer no harm as a result if the decision is allowed to stand. They would own Tract I outright, have no more obligation on the other tracts, and Hoffman would shoulder the burden for the Partnership of paying off the loan to Kuznik.

The Master also found the act to be *ultra vires* and therefore beyond the scope of protection by the business judgment rule. Having previously determined that the partnership agreement did not grant the partners the right to default on the loan, we agree the act was *ultra vires*. The partners may exercise only those acts which are permitted by law or by the partnership agreement, acts beyond the scope of the powers so granted are ultra vires. "The 'business judgment' rule applies to *intra vires* . . . not to *ultra vires* acts." *Seabrook Island Property Owners Assoc. v. Pelzer*, 292 S.C. 343, 348, 356 S.E.2d 411, 414 (Ct.App.1987). *See Dockside Ass'n, Inc. v. Detyens*, 291 S.C. 214, 352 S.E.2d 714 (Ct.App. 1987). As a result, we conclude there was no error in the Master's decision that the business judgment rule would not apply.

### E. Partners' Breach of Fiduciary Duty

As Justice Frankfurter stated in *SEC v. Chenery Corp.*, 318 U.S. 80, 86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943):

[T]o say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

The partners of Bees Ferry owed the Partnership and each other a duty of loyalty, good faith, and fair dealing. They were to conduct their business with the "punctilio of honor the most sensitive." Hoffman was owed this duty of loyalty and fair dealing by the capital call partners in the Partnership, and every decision must be made to prevent self-interests from being placed above the interest of the other partners.

In *Corley v. Ott*, 326 S.C. 89, 485 S.E.2d 97 (1997), the Court held a partner's failure to disclose to another partner that he had purchased land later purchased by the partnership constituted a breach of fiduciary duty even though a written partnership agreement did not come into existence until after the land was purchased. The Court found the purchase of the land was intimately connected with the formation of the partnership and a partnership arose by implication prior to the written agreement. In like manner, Hoffman and Meyer's

negotiations with Kuznik for an assignable option and Hoffman's agreement to remain liable on the note were intimately connected with and accomplished in anticipation of the formation of the Partnership. Therefore, the Partnership may not avoid its duty to Hoffman by declaring it had not yet come into existence and Hoffman's obligation was a personal liability undertaken prior to the formation of the Partnership.

By deciding to default on the loans and placing the entire burden of their payment on Hoffman, the partners violated their duty of fair dealing and loyalty. They placed their own economic interests above those of a fellow partner, and the outcome was most unconscionable. Since the decision was laced with self-interests, the Partnership could not be protected by the business judgment rule. The partners' actions were in violation of Hoffman's trust and confidence, and were a breach of the partnership agreement. We rule the actions taken by the partners in defaulting on the loan to Kuznik, allowing the property to be foreclosed, and forcing Hoffman to shoulder the burden of paying off the entire amount are a violation of their fiduciary duties to Hoffman.

## V. Contractual Indemnity

Hoffman is entitled to indemnity under the terms of the partnership agreement and under South Carolina law. Because Hoffman's right to indemnity arose by virtue of the contract, it is reviewed under the same standard as the breach of fiduciary duty and the breach of contract action. *See Town of Winnsboro v. Wiedeman–Singleton, Inc. (Winnsboro I)*, 303 S.C. 52, 398 S.E.2d 500 (Ct.App.1990), *aff'd*, 307 S.C. 128, 414 S.E.2d 118 (1992) (*Winnsboro II* ) (holding right to indemnity may arise by contract); *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976) (holding in an action at law the factual findings will not be reversed unless they are without evidentiary support). The Master's ruling will be affirmed if there is any evidence to support it. The partnership agreement stated:

The Partnership shall indemnify any Partner against any loss or threat of loss as a result of any claim or legal proceeding related to the performance of any act concerning the business or activities of the Partnership so long as the

Partner was acting in good faith within what was reasonably believed to be in the best interest of the Partnership.

South Carolina Code Ann. § 33–41–510 (1990) further provides:

The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

. . . .

(2) The partnership must indemnify every partner in respect of payments made, and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business or for the preservation of its business or property;

The payment of the debt to Kuznik indubitably constitutes an action "concerning the business or activities of the partnership." Hoffman, at the time of trial, had not paid the amount owed to Kuznik. However, this does not render the Partnership's obligation to indemnify him moot. The partnership agreement allowed indemnity for a "threat of loss," and a financial judgment against someone is, at a minimum, a threat of loss. The judgment is a lien, and as such, Hoffman has no choice but to pay the amount to Kuznik. The Partnership should not avoid its responsibility to Hoffman because he chose to seek indemnity prior to exchanging the amount owed.

██ The evidence upholds the Master's conclusion that Hoffman was entitled to indemnity. The debt owed to Kuznik was a legal obligation of the Partnership. The Partners defaulted on the payments, and subsequently, the property entered foreclosure. Kuznik was granted a deficiency judgment against Hoffman on the note, and Hoffman has the obligation to make payment. The judgment against Hoffman and the payments to be made are in the course of the Partnership's business, and therefore should be the responsibility of the Partnership. We affirm the Master's decision granting Hoffman indemnity under the partnership agreement.

## VI. Equitable Subrogation

██ Subrogation can arise by statute, by contract, or through equity. *Dailey v. Secura Ins. Co.*, 164 Wis.2d 624,

476 N.W.2d 299 (Ct.App.1991). Conventional subrogation arises by contract and is specifically bargained for by the parties. In contrast, equitable (or legal) subrogation is implied subrogation that arises under the common law. As explicated in *Shumpert v. Time Ins. Co.*, 329 S.C. 605, 496 S.E.2d 653 (Ct.App.1998):

> "Subrogation may be broadly defined as the substitution of one person in the place of another with reference to a lawful claim or right." 73 Am.Jur.2d *Subrogation* § 1 (1974).... Subrogation enables the insurer to recover the amount paid to its insured out of any judgment or settlement proceeds received by the insured from the third party.
>
> Subrogation can arise by statute, by contract, or through equity. *Dailey v. Secura Ins. Co.*, 164 Wis.2d 624, 476 N.W.2d 299 (Ct.App.1991). Conventional subrogation arises by contract and is specifically bargained for by the parties. In contrast, equitable (or legal) subrogation is implied subrogation that arises under the common law.
>
> Legal subrogation is not dependent upon contract. The doctrine is an equitable one, founded not upon any fixed law, but upon principles of natural justice; *its purpose is to require the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it;* and it is to be applied according to the dictates of equity and good conscience in the light of the actions and relationship of the parties. *Calvert Fire Ins. Co. v. James*, 236 S.C. 431, 435, 114 S.E.2d 832, 834 (1960).
>
> The elements of the doctrine of equitable subrogation are (1) the party claiming subrogation has paid the debt; (2) the party was not a volunteer, but had a direct interest in the discharge of the debt or lien; (3) the party was secondarily liable for the debt or for the discharge of the lien; and (4) no injustice will be done to the other party by the allowance of the equity. *United Carolina Bank v. Caroprop, Ltd.*, 316 S.C. 1, 446 S.E.2d 415 (1994).

*Shumpert*, 329 S.C. at 611–12, 496 S.E.2d at 656 (emphasis added).

■ The Partnership maintains Hoffman failed to plead equitable subrogation in his Amended Answer and Third Party Complaint. The Master relied on *Black's Law Dictio-*

*nary* definitions to determine that when Hoffman pled indemnity, he placed the Partnership on notice of a claim for equitable subrogation. The Master said: "This court is aware there are technical distinctions between the two concepts, but they exist mainly as a way of framing the issue. The third-party defendants had notice of the claim of subrogation when the defense of indemnity was raised in this case." We disagree.

Hoffman's claim for indemnity arises out of the partnership agreement's indemnity clause. It is a contractual basis for indemnity and not an equitable one. Equitable subrogation requires the claimant to prove he paid the debt as a secondarily liable party to the debt. Nowhere in the Amended Answer and Third–Party Complaint does Hoffman plead the required elements of equitable subrogation. The claim for equitable subrogation cannot be "bootstrapped" onto the claim for contractual indemnity.

However, even if Hoffman plead equitable subrogation, it would have been futile. Under equitable subrogation, he would step into the shoes of the original creditor. *See Dodge City of Spartanburg, Inc. v. Jones*, 317 S.C. 491, 454 S.E.2d 918 (Ct.App.1995) (through doctrine of equitable subrogation, subsequent creditor can assume rights and priority of prior creditor). In this case, the creditor was Kuznik. The note signed by the Partnership was a nonrecourse note. As such, Kuznik had no recourse against the Partnership or its partners. By extension, Hoffman, claiming under equitable subrogation, would have no recourse against the Partnership or individual partners. We reverse the finding of the Master granting Hoffman reimbursement under the doctrine of equitable subrogation.

## VII. Hoffman's Appeal

### A. Civil Conspiracy

Hoffman asserts the Master erred in dismissing his cause of action for civil conspiracy. The Master held no action for civil conspiracy may lie when the conspiracy is discussed openly rather than surreptitiously. We disagree. An action for civil conspiracy does not require the element of secrecy.

▮ It is well-settled in South Carolina that the tort of civil conspiracy contains three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special damage. *See Future Group, II v. Nationsbank,* 324 S.C. 89, 478 S.E.2d 45 (1996); *LaMotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66, 370 S.E.2d 711 (1988); *Lee v. Chesterfield Gen. Hosp., Inc.,* 289 S.C. 6, 344 S.E.2d 379 (Ct.App.1986).

▮ Clandestine activity is not an element of a civil conspiracy though many conspiracies are furtively formed thereby making proof of the conspiracy difficult for a plaintiff. Consequently, civil conspiracy has been characterized as "an act which is, by its very nature, covert and clandestine and usually not susceptible of proof by direct evidence." *First Union Nat'l Bank of S.C. v. Soden,* 333 S.C. 554, 575, 511 S.E.2d 372, 383 (Ct.App.1998) (quoting *Island Car Wash, Inc. v. Norris,* 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct.App. 1987)). We find the Master erred in concluding secrecy was an essential element of a civil conspiracy. Nonetheless, we affirm the Master's dismissal of Hoffman's cause of action for civil conspiracy on additional grounds.[3]

▮ An action for civil conspiracy will not lie if a plaintiff has obtained relief through other avenues. *See Todd v. South Carolina Farm Bureau Mut. Ins. Co.,* 276 S.C. 284, 278 S.E.2d 607 (1981). This is a unique feature of the tort of civil conspiracy. The Supreme Court expounded:

> "Where the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong."

---

**3.** This court may affirm for any ground appearing in the record. *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000) (appellate court may review respondent's additional reasons and, if convinced it is proper and fair to do so, rely on them or any other reason appearing in the record to affirm the lower court's judgment; appellate court may not rely on Rule 220(c), SCACR, when reason does not appear in record, or when court believes it would be unwise or unjust to do so in a particular case; it is within appellate court's discretion whether to address any additional sustaining grounds).

*Todd,* 276 S.C. at 293, 278 S.E.2d at 611 (quoting 15A C.J.S. *Conspiracy* § 33 (1967)).

Because Hoffman, like Todd, merely realleged the prior acts complained of in his other causes of action as a conspiracy action but failed to plead additional acts in furtherance of the conspiracy, he was not entitled to maintain his conspiracy cause of action. Additionally, we have affirmed Hoffman's damages under breach of contract and breach of fiduciary duty. Hoffman is thus precluded from recovering additional damages under conspiracy for the same acts for which he obtained relief under these other causes of action.

### B. Punitive Damages

Hoffman challenges the Master's denial of punitive damages. In this state, the award of punitive damages is controlled by statute. South Carolina Code Ann. § 15–33–135 (Supp.1999) provides: "In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence." The trial judge has considerable discretion regarding the amount of damages both actual or punitive awarded. *See Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996); *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991); *Lister v. NationsBank of Delaware, N.A.,* 329 S.C. 133, 494 S.E.2d 449 (Ct.App.1997). Because of this discretion, our review on appeal is limited to the correction of errors of law. *Id.*

To justify an award of punitive damages, a plaintiff must demonstrate the defendants' conduct was willful, wanton, or undertaken in reckless disregard of plaintiff's rights. *See McGee v. Bruce Hosp. Sys.,* 321 S.C. 340, 468 S.E.2d 633 (1996). Willfulness has been defined as a conscious failure to exercise due care. *See Hawkins v. Pathology Assocs. of Greenville, P.A.,* 330 S.C. 92, 498 S.E.2d 395 (Ct.App.1998).

Hoffman specifically contends the Master erroneously based his ruling solely on the fact the capital call partners relied on the advice of counsel in reaching the decision to cease payments on the loan. The Master's order articulated:

> The capital call partners took the action they did precisely. for the reason that they knew Kuznik had no recourse

against them. To the man they testified they knew their actions would have devastating legal consequences to Hoffman, their fellow partner. There is no "punctilio of honor" in that conduct or that way of thinking. The only reason that this court can find that men of standing in this community would act in such a way is because they were told it was legal to do so by their counsel. This fact alone restrains this court from imposing punitive damages against the partners for their actions taken against Hoffman.

 We hold advice of counsel is merely one factor to be considered in determining whether a defendant has acted willfully, wantonly, or recklessly. Despite the Master's assertion that a single fact restrained him from imposing punitive damages, we find an examination of the totality of the evidence in the record does not justify the imposition of punitive damages in this case. Hoffman's partners believed, whether correctly or incorrectly, there was some legal basis for their decision to stop payments on the loan. The partners relied on Meyer and the managing partners to guide them in business decisions regarding the Partnership. Meyer recommended the partners discontinue making payments. Although none of these factors excuses the partners' breach of their fiduciary duty and breach of the partnership agreement, they do support the Master's decision not to impose punitive damages. Consequently, we hold the Master did not abuse his discretion in declining to award punitive damages.

### C. Uniform Limited Partnership Act

 Hoffman claims the Master erred in dismissing his cause of action based on the Uniform Limited Partnership Act, S.C.Code Ann. §§ 33–42–10 to –2040 (1990 & Supp.1999). We disagree. Hoffman conceded the Partnership was a general rather than limited partnership. It was not subject to the requirements of the Uniform Limited Partnership Act. Hence, no cause of action may be sustained under the Act. We affirm the Master's dismissal of Hoffman's ULPA cause of action.

### CONCLUSION

We conclude the purchase money note from Kuznik was an obligation of the Partnership, even given its nonrecourse

status. The partnership agreement did not provide the partners with the authority to default on their capital call payments, thereby allowing the property to enter foreclosure. By failing to make their capital calls and pay the debt owed to Kuznik, the partners breached the partnership agreement.

The partners owed a fiduciary duty to Hoffman. Their decision to stop payment of capital calls and allow the property to be foreclosed caused harm to Hoffman. However, we rule a decision made by the partners in a general partnership may be protected by the business judgment rule. To receive protection under the business judgment rule, a party must meet the following criteria:

(1) The decision must be made in good faith;

(2) The decision must be made with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) The decision must be made in a manner the partner reasonably believes to be in the best interest of the partnership.

*The business judgment rule will not apply if the partner has engaged in self-dealing, fraud, or other unconscionable conduct.* The action taken by the partners to stop payment on the note was in the interest of the capital call partners, but was to Hoffman's detriment. Partners are not to put their own interests above those of other partners. The decision made by the capital call partners is not protected by the business judgment rule. Concomitantly, we find the partners breached their fiduciary duty to Hoffman.

Hoffman is entitled to indemnity under the terms of the partnership agreement. The payment of the deficiency judgment is in the course of the business of the partnership. Equitable subrogation is not sufficiently pled by pleading contractual indemnity. Hoffman failed to plead the required elements of equitable subrogation, and even if he had, he would not be able to recover. Under the doctrine of equitable subrogation, he would stand in the shoes of Kuznik, and since the note was nonrecourse, Kuznik had no claim against the Partnership or the individual partners.

On Hoffman's counter appeal, we find secrecy is not an element of civil conspiracy. However, Hoffman is not entitled to recover under a claim for civil conspiracy, because it is based on the same acts for which he has already received relief. We hold there was no abuse of discretion by the Master in denying punitive damages. Accordingly, the decision of the Master is

**AFFIRMED IN PART, REVERSED IN PART.**

GOOLSBY and HUFF, JJ., concur.