**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1932**

CALVIN ANTHONY,

　　　　　Plaintiff - Appellee,

　　　v.

ROBERT WARD; CHARLES SHEPPARD, in their individual
capacities,

　　　　　Defendants – Appellants,

　　　and

SOUTH CAROLINA DEPARTMENT OF CORRECTIONS,

　　　　　Defendant.

Appeal from the United States District Court for the District of
South Carolina, at Columbia.　Margaret B. Seymour, District
Judge.　(3:05-cv-01636-MBS)

Argued: May 12, 2009　　　　　　　　Decided: July 7, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and Frederick P.
STAMP, Jr., Senior United States District Judge for the Northern
District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** William L. Howard, Sr., YOUNG, CLEMENT & RIVERS, LLP,
Charleston, South Carolina, for Appellants.　J. Lewis Mann
Cromer, CROMER & MABRY, Columbia, South Carolina, for Appellee.

**ON BRIEF:** Stephen L. Brown, YOUNG, CLEMENT & RIVERS, LLP, Charleston, South Carolina, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendants Robert Ward and Charles Sheppard, officials in the South Carolina Department of Corrections (SCDC or the Department), appeal a judgment based on a jury award of $510,000 to plaintiff Calvin Anthony, the former warden of Lee Correctional Institution, for civil conspiracy under South Carolina law. According to Anthony, Ward and Sheppard conspired for personal and malicious reasons to force his termination from the Department. On appeal Ward and Sheppard raise numerous challenges to trial and post-trial proceedings. Because we conclude that there is no reversible error, we affirm the judgment.

I.

We recite the facts in the light most favorable to Anthony, the prevailing party. See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 258 (4th Cir. 2001). From 1999 until his involuntary retirement from the Department in 2004, Anthony was the warden at Lee Correctional Institution, a maximum security prison in South Carolina. Anthony, who is African-American, began working for the Central Correctional Institution at SCDC in 1978. He was promoted through the ranks and attained his wardenship at Lee in 1999. Anthony received excellent reviews as a warden from 1999 until 2002 and was named Warden of the

3

Year in 2002. In 2002 defendant Ward, the Director of Operations for SCDC, became Anthony's supervisor and thereafter Anthony did not receive evaluations.

Anthony initially drew Ward's ire following a hostage situation that occurred at Lee in late October 2003, during Anthony's tenure at that institution. At the time of the hostage incident, Laurie Bessinger was the Director of Security and Training at SCDC. Bessinger had been a candidate for Ward's job as Director of Operations. After Bessinger was passed over for the Operations Director position, he was placed under the supervision of defendant Charles Sheppard, the Inspector General for SCDC, with whom Bessinger had an acrimonious relationship. Even before the hostage situation Sheppard sought to undermine and discredit Bessinger, soliciting information from Bessinger's subordinates to accomplish that goal.

Both Ward and Sheppard voiced strong disapproval of Bessinger's handling of the hostage situation at Lee, and Ward went so far as to ask Jon Ozmint, the Director of SCDC, to "relieve" Bessinger the night of the incident. J.A. 1067. Anthony, as the warden of Lee, was responsible for compiling an After Action Report about what had occurred that night. After Anthony gave Ward a draft of the report, Ward asked Anthony to "put some negative things in" the report about Bessinger, J.A.

4

155, including things that were untrue. Anthony refused and thereafter Ward's attitude toward him changed.

Sheppard's dislike for Anthony stemmed from Anthony's role in the grievance process of Rickie Harrison, an African-American warden at Kershaw Correctional Institution who was demoted by Ward in 2002. The events leading to Harrison's demotion began with a surprise "shakedown" (or inspection) of Kershaw. In Harrison's eighteen years of experience as a warden, this was the only shakedown that had occurred without the warden receiving prior notification. Sheppard was Harrison's interviewer during the investigation following the shakedown and ultimately recommended Harrison's demotion. After Harrison's demotion, Sheppard handled both the investigation of Harrison's grievance and acted as the lawyer for the SCDC at the grievance hearing, which was an unprecedented action for the Inspector General. Sheppard initially subpoenaed Anthony to testify at the grievance hearing, but after Anthony made pre-hearing statements to Sheppard and others in the Department that he believed Harrison was the victim of racial discrimination, Sheppard declined to call Anthony as a witness.

Like Harrison's demotion, Anthony's termination from SCDC resulted from an unannounced shakedown of his institution. In the spring of 2003 Sheppard placed an investigator, Karen Hair, at Lee. Hair reported directly to Sheppard, and Anthony

had no knowledge of the nature of Hair's investigative activities prior to the shakedown. At 6 a.m. on January 29, 2004, Anthony received a call from Ward informing him that a shakedown of Lee was about to commence. As with the shakedown at Kershaw, but unlike any other shakedown Anthony (or Bessinger) could remember, Anthony was given no advance warning of the event. Ward participated directly in the shakedown.

The shakedown targeted the boiler room at Lee. The inspection revealed a significant number of items in the boiler room that were classified by Ward and Sheppard as contraband, including unaccounted for computer parts, televisions, cameras, a scanner and various bulk food items. The inspection also revealed a number of other irregularities in the boiler room, including inmates working without supervision, possible access to outside phone lines and the Internet, and video surveillance cameras being used to monitor entry and exit from the room.

There were four levels of oversight of the boiler room below Anthony on the prison's organizational chart, and Anthony himself was never linked to any of the problems that occurred in the boiler room. Anthony inspected the boiler room regularly, including within the month prior to the shakedown, but had not observed anything out of the ordinary. During his inspections he checked mainly for cleanliness and sanitation, and not to see whether there were unauthorized computers in the room.

Regarding unsupervised inmates, there were identical memoranda dating from 1996 and 2000 and posted on the walls in the boiler room that authorized inmates to work in the room with minimal supervision from the courtyard officer in the event that the officer with direct supervision over the boiler room needed to attend to business outside the room. The former memorandum predated Anthony's wardenship, but the latter was signed by Anthony and the four other employees with direct supervisory responsibility over the boiler room.

In April 2004, slightly over two months after the shakedown, Anthony made a decision to pursue the Teacher and Employee Retention Initiative (TERI) -- a program through which qualified employees are permitted to retire early, begin receiving their retirement, and at the same time return to work for a substantial fraction of their original pay. Anthony informed Ward about his decision to "accept the retirement opportunity," and Ward told him that he was "approved and to plan to return." J.A. 201-02. Ward also informed Anthony at that time that the investigation was over: "don't worry about it, go back to your institution and run your institution, because that's over with." J.A. 202.

On June 16, 2004, Anthony's immediate supervisor, Carl Fredericks, handed Anthony a corrective action charging him with gross negligence (for permitting inmates to work unsupervised in

7

the boiler room) and falsification of documents (specifically, documents signed by Anthony in which he stated that he had inspected the maintenance area of Lee, in which the boiler room was located, and failed to detect any of the irregularities discovered during the shakedown). Anthony maintained that he never falsified any documents. He talked with Sheppard after receiving the corrective action, and Sheppard told him to "think about retiring." J.A. 253. On June 22, 2004, Anthony met with Ward and was informed that if he had not already put in his retirement papers, he would have been terminated. He was permitted to retire in lieu of termination.

Anthony then filed this action in federal district court for the District of South Carolina. He sued Ward and Sheppard in their individual capacities alleging that they conspired to force him out of his job at Lee. His complaint also included a claim against the Department itself alleging that he was discriminated against on the basis of his race in violation of Title VII of the 1991 Civil Rights Act. The case went to trial and the jury returned a verdict in SCDC's favor on the Title VII discrimination claim and in Anthony's favor on the civil conspiracy claim. The jury awarded Anthony $510,000 in damages against Ward and Sheppard in their individual capacities. Ward and Sheppard appeal.

II.

Ward and Sheppard first contend that the district court erred in refusing their proposed jury instructions on the intracorporate conspiracy doctrine. We review jury instructions for abuse of discretion. Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 432 (4th Cir. 2004); see also S. Atl. Ltd. P'ship of Tenn. v. Riese, 284 F.3d 518, 530 (4th Cir. 2002). "The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." Chaudhry v. Gallerizzo, 174 F.3d 394, 408 (4th Cir. 1999). "An error of law constitutes an abuse of discretion." A Helping Hand, LLC v. Balt. County, Md., 515 F.3d 356, 370 (4th Cir. 2008). However, "[w]e will not set aside a jury verdict based on an instructional error 'unless the erroneous instruction seriously prejudiced the challenging party's case.'" Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005) (quoting College Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th Cir. 2005)).

Under South Carolina law "[a] civil conspiracy . . . consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage." Lee v. Chesterfield Gen. Hosp., Inc., 344 S.E.2d 379, 382 (S.C. Ct. App. 1986). South Carolina courts have recognized an exception to civil conspiracy

9

liability when all the alleged members of a conspiracy are agents of a single corporate entity and act on behalf of the corporation: a so-called intracorporate conspiracy. See McMillan v. Oconee Mem. Hosp., Inc., 626 S.E.2d 884, 886-87 (S.C. 2006); Anderson v. S. Ry. Co., 77 S.E.2d 350, 351 (S.C. 1953).

The intracorporate conspiracy doctrine in South Carolina draws its origins from Goble v. American Railway Express Co., where the state Supreme Court indicated that "it is impossible to conceive that a conspiracy between a corporation and its agents may be established by the act of such agents alone." 115 S.E. 900, 903 (S.C. 1923). More recently, the South Carolina Court of Appeals held that although "a corporation, as a legal person in contemplation of law, cannot conspire with itself," "the agents of a corporation are legally capable, as individuals, of conspiracy among themselves or with third parties." Lee, 344 S.E.2d at 383.

The district court below interpreted the above cases as distinguishing between two types of civil conspiracies: (1) principal-agent conspiracies and (2) conspiracies between agents of a corporation. Based on its reading of South Carolina case law, the court concluded that the intracorporate conspiracy doctrine in South Carolina only applies to principal-agent conspiracies. Because the facts of this case placed it

10

"squarely within" the latter context, the district court concluded that an instruction on civil conspiracy was unwarranted. J.A. 2071.

Defendants, in contrast, assert that immunity for intracorporate conspiracy only ceases to apply when agents or employees of a corporation step outside the course and scope of their employment and act as individuals rather than as agents of the corporation. Defendants argue that the district court erred in refusing a jury instruction on "whether or not [Defendants] were acting for the interest of their employer and in the course and scope of their employment." Appellants' Br. at 16. According to defendants, the scope of employment question is "quintessentially a factual issue" and must therefore be resolved by the jury. Appellants' Reply Br. at 4.

In McMillan the South Carolina Supreme Court indicated that scope of employment was relevant to the intracorporate conspiracy doctrine, holding that "no conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." 626 S.E.2d at 887 (emphasis added). Other courts have similarly held scope of employment to be relevant under the doctrine. See Garza v. City of Omaha, 814 F.2d 553, 556 (8th Cir. 1987) ("While it is true that a corporation cannot conspire with

11

itself, an intracorporate conspiracy may be established where individual defendants are also named and those defendants act outside the scope of their employment for personal reasons.") (emphasis added); McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) ("Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.") (emphasis added). Our circuit has recognized a similar "personal stake exception," holding that (under Virginia's civil conspiracy law) "the intracorporate immunity doctrine does not apply where a corporate officer has an independent personal stake in achieving the corporation's illegal objectives." ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) (internal quotations omitted).

The jury verdict form in this case failed to explicitly address whether Ward and Sheppard were acting within the scope of their employment, and they made a timely objection before the district court. We conclude, however, that even if the district court erred in failing to give the requested instruction, the error was not seriously prejudicial when considered in light of the record as a whole.

The verdict form specifically required the jury to find that Ward and Sheppard had entered into an agreement "for

12

the purpose of injuring [Anthony]." J.A. 2007 (emphasis added).

The jury was also instructed that:

> With respect to the second element [of civil conspiracy], the plaintiff must prove by a preponderance of the evidence that Mr. Ward and Mr. Sheppard specifically intended to injure the plaintiff. The primary purpose of the alleged agreement or conspiracy must be to injure the plaintiff. Mere speculation about a party's motives with respect to certain conduct does not constitute proof of conspiracy.

J.A. 1965. Further, there was ample evidence adduced at trial that Ward's and Sheppard's actions toward Anthony were personally, rather than professionally, motivated. Anthony provided evidence that Ward disliked him, not for any professionally relevant reason, but because he had refused to accommodate Ward's request that he alter his After Action Report to make it more unfavorable to Bessinger. Similarly, Anthony's refusal to testify negatively about Warden Harrison during Sheppard's handling of Harrison's grievance hearing motivated Sheppard to act against Anthony's interests. Defendants' decisions to act contrary to longstanding custom, for example by declining to give Anthony advance notice of the January 2004 shakedown of Lee, is similarly suggestive of a personal, rather than a professional, motive. And finally, Anthony introduced considerable evidence at trial that wardens at other institutions in which security lapses were discovered that were comparable to those at Lee, but against whom defendants did not

13

bear any personal grudge, were permitted to continue working or participate in the TERI program.

In sum, the finding of a specific intent to injure Anthony, coupled with the evidence that defendants had a personal stake in injuring plaintiff, leads us to conclude the error in this case was not seriously prejudicial. Thus, although the district court erred in refusing to give the requested scope of employment instruction, we conclude that this error does not necessitate a new trial.

## III.

Ward and Sheppard next contend that the district court erred in failing to charge the jury on immunity from suit under the South Carolina Tort Claims Act (SCTCA). We review a court's failure to give a requested jury instruction under the abuse of discretion standard described above.

S.C. Code Ann. § 15-78-70 provides that:

> (a) This chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided in subsection (b).

> (b) Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud,

14

actual malice, intent to harm, or a crime involving moral turpitude.

S.C. Code Ann. § 15-78-70(a), (b) (2005). Under S.C. Code Ann. § 15-78-30: "'Scope of official duty' or 'scope of state employment' means (1) acting in and about the official business of a governmental entity and (2) performing official duties." S.C. Code Ann. § 15-78-30(i) (2005).

Defendants argue that the desire to terminate an employee cannot constitute intent to harm because "any time a supervising government employee participates in sanctioning an employee, they, by definition, intend to do that employee 'harm' in the general sense of the word." Appellants' Br. at 20. Consequently, defendants say, "intent to harm" under the SCTCA "must require a malicious or personal motivation in order for the exception to become operable." Id. Defendants note that malice or intent to harm must be "proved" under § 15-78-70(b), and they contend that mere allegations are therefore insufficient.

The district court concluded that the SCTCA is not intended to protect state employees from liability for intentional torts, noting that "irrespective of whether Defendants Ward and Sheppard acted outside the scope of their official duty, they are not immune from suit under the SCTCA

15

because their conduct was proven to be intentionally tortious."

J.A. 2079. The court determined that

> it was not necessary . . . to give additional charges to the jury regarding intent to harm because the elements of civil conspiracy, an intentional tort, already encompass such intent. The jury's finding that Defendants had civilly conspired against Plaintiff was sufficient to remove from the purview of the SCTCA's protected class of government employees.

Id. We agree. The jury was specifically required to find that defendants intentionally injured Anthony in order to award damages on the civil conspiracy claim: namely, that Ward and Sheppard entered into an agreement "for the purpose of injuring Plaintiff." J.A. 2007. The jury was also instructed that it must find Anthony had proved by a preponderance of the evidence that defendants "specifically intended to injure the plaintiff" and that this was "[t]he primary purpose of the alleged agreement or conspiracy." J.A. 1965. The district court therefore did not abuse its discretion in refusing to include an additional jury instruction on scope of employment under the SCTCA.

IV.

Ward and Sheppard further contend that they were entitled to judgment as a matter of law based on Anthony's failure to allege and prove special damages or, in the alternative, that the district court erred in failing to

16

adequately charge the jury on special damages as an element of civil conspiracy. Specifically, defendants contend that Anthony neither alleged[1] nor proved damages under the civil conspiracy claim over and above those alleged for the race discrimination claim.

A.

In reviewing whether plaintiff has proved special damages, we view the evidence in the light most favorable to the plaintiff as the non-moving party, drawing all reasonable inferences in his favor without weighing the evidence or credibility of the witnesses. Baynard v. Malone, 268 F.3d 228, 234-35 (4th Cir. 2001) ("The question is whether a jury, viewing the evidence in the light most favorable to [the non-moving party], could have properly reached the conclusion reached by this jury."). "We must reverse if a reasonable jury could only rule in favor of [the movant]; if reasonable minds could differ, we must affirm." Id. at 235.

---

[1] Defendants devote much of their briefing to arguing that the damages sought in the race discrimination and civil conspiracy claims were largely overlapping and therefore Anthony failed to adequately allege special damages. This argument was not raised before trial and is therefore untimely. On a motion for judgment as a matter of law, the relevant question is not whether Anthony adequately alleged special damages but whether he proved special damages at trial.

17

As noted above, the third element of a civil conspiracy in South Carolina is that the defendants' agreement to injure the plaintiff "causes special damages." Pye v. Estate of Fox, 633 S.E.2d 505, 511 (S.C. 2006). According to Pye, "[b]ecause the quiddity of a civil conspiracy claim is the damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." Id. In Todd v. South Carolina Farm Bureau Mutual Insurance Co., the South Carolina Supreme Court held that "[w]here the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." 278 S.E.2d 607, 611 (1981) (quoting 15A C.J.S. Conspiracy § 33 (1967), at 718). The plaintiff in Todd had brought five causes of action, including four tort claims and a fifth claim for "conspiracy to so damage the plaintiff." 278 S.E.2d at 608. As the court pointed out, "[t]he fifth cause of action simply takes all the prior allegations and alleges that the acts were done in furtherance of a conspiracy among the defendants. Damages are then sought for injury resulting from the conspiracy." Id. at 611. The court held that "[t]he trial judge erred by overruling the demurrer to the conspiracy cause of action in the complaint,

18

since Todd can recover no additional damages for the alleged fifth cause of action."  Id.

The case law makes clear that the concern is with a plaintiff receiving a double recovery.  See Kuznik v. Bees Ferry Assocs., 538 S.E.2d 15, 31 (S.C. Ct. App. 2000) ("An action for civil conspiracy will not lie if a plaintiff has obtained relief through other avenues.").  Here, because the jury only awarded damages on one of the two claims in this case, there is no possibility that plaintiff received an impermissible double recovery.  See Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Planning Corp., 596 S.E.2d 51, 60 (S.C. 2004) ("The damages alleged in [plaintiff's] breach of fiduciary duty and conspiracy claims are similar.  However, since the referee directed the verdict in favor of [defendant] on [plaintiff's] breach of fiduciary duty claim, [defendant] is not twice subject to payment for damages for the same act.  There is no error.").  Defendants failed to challenge the adequacy of Anthony's complaint prior to trial, and the jury awarded damages on only one of Anthony's two claims.  Consequently, any deficiency in the complaint was harmless; defendants are not entitled to judgment as a matter of law based on a failure to prove special damages.

B.

Ward and Sheppard also contend that the trial court erred in refusing their requests "to elaborate sufficiently to allow the jury, as laymen, to understand the element of special damages as it applies to a cause of action for civil conspiracy." Appellants' Br. at 27-28. Defendants argue that the trial court's instructions on the special damages requirement were misleading and confusing because they led the jury to believe that if Anthony was awarded no damages under the discrimination claim, any damages awarded under a civil conspiracy claim would necessarily satisfy the special damages requirement. Defendants fail, however, to indicate what alternative language they believe should have been used.[2]

On the issue of special damages, the judge instructed the jury as follows:

> With respect to the third element [of civil conspiracy], plaintiff must prove special damages. And special damages are damages for losses that are

---

[2] We also note that defendants' counsel never made any argument based on the distinction between general and special damages. South Carolina case law is clear that damages in a civil conspiracy action must not duplicate those alleged in other causes of action. South Carolina courts have been less clear about what additional specific limitations might exist with respect to damages that may be recovered on a civil conspiracy claim. See Gynecology Clinic, Inc. v. Cloer, 514 S.E.2d 592, 593 (S.C. 1999) (citing Charles v. Texas Co., 18 S.E.2d 719, 726-29 (S.C. 1942) (discussing available damages in context of unlawful conspiracy)).

20

not natural and proximate -- that are not the natural and proximate result of the injury. The plaintiff must sufficiently state and claim special damages.

This element is an important element in the tort of civil conspiracy because it requires a showing of the damage resulting to plaintiff from an overt act done pursuant to the alleged conspiracy.

The damage alleged must go beyond the damages alleged in other causes of action. In other words, plaintiff must prove that he had incurred damages greater or different from the damages arising from his discrimination claim.

Different damages are damages over and above the damages he alleged he suffered from the other claim. Damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting due to the race discrimination claim.

J.A. 1965-66.

We disagree with defendants that these instructions misstate the relationship between damages recoverable for the race discrimination and civil conspiracy claims. See Pye, 633 S.E.2d at 511. The jury was instructed that damages for the civil conspiracy must be different from those for the race discrimination claim and that it must not award damages on the civil conspiracy claim if it concluded that these damages were merely duplicative of those in the race discrimination claim. See Peoples Fed. Sav. & Loan, 596 S.E.2d at 60. This is correct. We therefore conclude that the district court did not abuse its discretion with respect to the special damages instruction.

21

V.

Ward and Sheppard next contend that they are entitled to judgment as a matter of law based on Anthony's failure to prove a "combination" between defendants and because the jury verdict was contrary to the weight of the evidence presented. As explained above in part IV.A, "[w]e must reverse if a reasonable jury could only rule in favor of [the movant]; if reasonable minds could differ, we must affirm." Baynard v. Malone, 268 F.3d at 235.

Under South Carolina law "[a] conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the plaintiff." A Fisherman's Best, Inc. v. Recreational Fishing Alliance, 310 F.3d 183, 195 (4th Cir. 2002) (citing First Union Nat'l Bank of S.C. v. Soden, 511 S.E.2d 372, 383 (S.C. Ct. App. 1998)). However, "[c]ivil conspiracy is an act which is, by its very nature, covert and clandestine and usually not susceptible of proof by direct evidence." First Union, 511 S.E.2d at 383. Consequently, "[c]onspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators and other circumstances." Island Car Wash, Inc. v. Norris, 358 S.E.2d 150, 153 (S.C. Ct. App. 1987) (noting also that "concert of action, amounting to a conspiracy, may be shown by circumstantial as well as direct evidence").

22

Defendants claim that Anthony introduced "no evidence of any combination or agreement between Appellants Ward and Sheppard." Appellants' Br. at 30. They claim that "[t]here was no testimony that [Defendants] had any discussions, meetings or other communications regarding the investigation into the discrepancies in [Anthony's] official reports, or played any role in making the decision as to the appropriate level of discipline to be recommended to Director Ozmint." Id. at 30-31.

In response, Anthony contends that "[t]he nature of the acts committed and the relationship of Ward and Sheppard itself is evidence of conspiracy." Appellee's Br. at 33. According to Anthony, "[t]here were numerous times that Ward and Sheppard met in discussion of Anthony, and Ward and Sheppard acted together, in concert, in a course of action that was contrary to the normal policy and procedure at SCDC, but which furthered their own personal objective to harm Anthony." Id.

We agree with Anthony that the jury heard sufficient evidence at trial regarding motive, opportunity, and concerted action from which to conclude that defendants reached an agreement to harm Anthony and committed civil conspiracy. With regard to motive, as discussed above in part II, Anthony provoked the enmity of both defendants by failing to cooperate with their efforts to discredit other employees in the Department. Anthony believed these efforts were inappropriate

23

and refused to be complicit. Regarding opportunity, despite attempting to downplay the connection between himself and Sheppard, Ward conceded at trial that he had a "professional friendship" with Sheppard and that the two men ate lunch together "a couple days a week." J.A. 1052. Ward also testified that he spoke with Sheppard about Laurie Bessinger's actions during the hostage situation at Lee. And Sheppard admitted forwarding to Ward an email he received from Inspector Hair about concerns over activities in the boiler room at Lee.

The jury also heard testimony regarding adverse actions taken by the defendants against other SCDC employees they disliked. Bessinger testified that the defendants acted in a concerted manner to force his own retirement by working together to discredit him. According to Bessinger, Sheppard initiated conversations with employees under Bessinger's direct supervision to try to elicit information which could be used to undermine and discredit Bessinger. Ward admitted that he asked Ozmint to "relieve" Bessinger on the night of the hostage situation. J.A. 1067. And Associate Warden Pridgen testified that on the night of the hostage incident Ward complained to him about Bessinger being a problem: "Bessinger's trying to run everything. But if you tell anybody, I'm going to tell them you are lying." J.A. 476.

24

Harrison, for his part, testified that Sheppard deviated from Department custom by personally serving as both investigator and then lawyer in Harrison's grievance hearing, which resulted in Harrison's demotion from warden of Kershaw. Sheppard served these roles despite the existence of a separate Office of General Counsel which acts as counsel for SCDC.

In Anthony's case, Ward admitted deviating from standard SCDC policy in failing to inform Anthony about the shakedown of Lee in January 2004, and he participated directly in the shakedown. John Near, the Human Resources Director for SCDC, testified that he does not know of any other warden who has ever been terminated or refused rehire because of an inspection-related issue. Warden Harrison also testified that he had never known of a warden losing his job either because of contraband found in an institution (absent firsthand involvement by the warden), or for failure to make inspections. Ultimately, we must conclude that reasonable minds could differ regarding the existence of a common design by Ward and Sheppard to harm Anthony. See Baynard, 268 F.3d at 235. Sufficient evidence was presented in this case for the jury to find that defendants conspired to bring about the forced retirement of Anthony. The jury verdict must therefore stand.

Defendants further contend that the district court erred in failing to charge the jury on the employment-at-will doctrine.  Again, as explained above in part II, we review jury instructions for abuse of discretion.

Under South Carolina law "[a]t-will employment is generally terminable by either party at any time, for any reason or for no reason at all."  Prescott v. Farmers Tel. Coop., Inc., 516 S.E.2d 923, 925 (S.C. 1999).  South Carolina recognizes only three exceptions to this general rule: (1) an employee has recourse against his employer for termination in violation of public policy; (2) an at-will employee may not be terminated for exercising constitutional rights; and (3) an employee has a cause of action against an employer who contractually alters the at-will relationship and terminates the employee in violation of the contract.  Nelson v. Charleston County Parks & Recreation Comm'n, 605 S.E.2d 744, 746 (S.C. Ct. App. 2004). The South Carolina Supreme Court has held that "an at-will employee may not maintain a civil conspiracy action against her employer." Angus v. Burroughs & Chapin Co., 628 S.E.2d 261, 262 (S.C. 2006) (citing Ross v. Life Ins. Co. of Va., 259 S.E.2d 814, 815 (S.C. 1979)).

Ward and Sheppard argue that Anthony was an at-will employee and that, to the extent that defendants were acting

26

within the scope of their employment, they are protected by the employment-at-will doctrine. Anthony counters that he was not terminated by SCDC but was instead refused rehire under South Carolina's TERI program. More important, Anthony points out that neither defendant actually had the power to terminate him; that power resided in Jon Ozmint, the Director of SCDC. Ward merely had the power to make a recommendation to Ozmint regarding what action SCDC should take; Sheppard lacked even this power. Because we agree with Anthony that his civil conspiracy claim is not against his employer, the employment-at-will doctrine is inapplicable. The district court did not abuse its discretion in failing to instruct the jury on the doctrine.

## VII.

Finally, defendants urge this court to consider the combined effect of the errors committed by the district court and claim that the cumulative effect of the errors occurring during trial mandates a remand for a new trial. See Beck v. Haik, 377 F.3d 624, 644-45 (6th Cir. 2004). Although this court has yet to determine whether the cumulative error doctrine applies in the civil context, cf. United States v. Martinez, 277 F.3d 517, 532-34 (4th Cir. 2002) (applying the cumulative error doctrine in the criminal context), we need not make this determination in order to resolve this case. Assuming without

27

deciding that such a doctrine is appropriate in the civil context, see Beck, 377 F.3d at 644-45 (adopting cumulative error doctrine in civil context), overruled on other grounds by Adkins v. Wolever, 554 F.3d 650 (6th Cir. 2009) (en banc); Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 188 (7th Cir. 1993) (same); Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993) (same); Hendler v. United States, 952 F.2d 1364, 1383 (Fed. Cir. 1991) (same); Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark, 366 F.2d 740, 742 (9th Cir. 1966) (same), but see SEC v. Infinity Group Co., 212 F.3d 180, 196 (3d Cir. 2000) (noting rejection of cumulative error doctrine in civil context), reversal would nevertheless be inappropriate in this case. The only error that occurred in this case was that the jury was not specifically asked to find that defendants acted outside the scope of their employment when they injured Anthony. As explained above, because we conclude that his error was not prejudicial, the cumulative error doctrine does nothing to alter this conclusion.

* * *

For the foregoing reasons, the judgment is

AFFIRMED.